**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| F-Squared Investment Management, LLC, *et al.*[1] | ) | Case No. 15-_____ (_____) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**DECLARATION OF DAVID N. PHELPS IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Under 28 U.S.C. § 1764, David N. Phelps declares as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer of F-Squared Investment Management, LLC ("**F-Squared**"), a Delaware limited liability company organized under the laws of the state of Delaware and its subsidiaries (collectively the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  I have served as the Chief Restructuring Advisor of the Debtors since May 19, 2015, and upon commencement of these Chapter 11 Cases on the date hereof I was appointed Chief Restructuring Officer of the Debtors.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      I am generally familiar with the Debtors' business, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records.  All facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' business, operations, and related financial information gathered from my review of their books

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788).  The Debtors' address is Wellesley Office Park, 80 William Street, Suite 400, Wellesley, Massachusetts 02481.

and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors. If called to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

3.       On July 8, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The purpose of these Chapter 11 filings is to facilitate the entry into an asset purchase agreement to sell substantially all of the Debtors' assets to Broadmeadow Capital, LLC ("**Broadmeadow**"), a wholly owned subsidiary of Cedar Capital, LLC ("**Cedar Capital**"), or another higher or otherwise better bidder pursuant to Section 363 of the Bankruptcy Code (the "**Sale**").

4.       I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business so as to preserve the business pending the Sale. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

5.       Part I of this First Day Declaration provides an overview of the Debtors' business, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors'

---

[2]       Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Motion.

financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Motions.

<u>**PART I**</u>

**A.    General Background**

6.    Founded in May 2006, the Debtors consist of SEC registered investment management firms with corporate headquarters in Wellesley, Massachusetts and a New Jersey based team of top tier scientists, mathematicians and programmers conducting research and development.  The Debtors' clients are generally investment advisors who sell the Debtors' model services to their own clients.  The Debtors serve clients in the advisor, institutional, retail and retirement markets.  As of March 31, 2015, the Debtors had over $16 billion in assets under advisement ("**AUA**"), although as set forth below, that number has subsequently declined.  The Debtors seek to provide an investment approach that repeatedly protects clients in down markets and helps them participate as much as possible in up markets.  The Debtors focus on delivering powerful and innovative investment solutions to help meet investor's expectations and financial goals.

7.    Specifically, the Debtors provide various index products (the "**Index Product Services**") on a non-discretionary basis to unaffiliated third parties, and separately provide discretionary investment advisory services (the "**Advisory Services**") based on those index products to various separately managed account ("**SMA**") clients.  For their the Index Product Services, F-Squared created and licensed a series of specialty indexes (the "**AlphaSector Indexes**") covering a range of asset classes.  The AlphaSector Indexes are based on sector rotation strategies that use quantitative models programmed to measure the volatility and price movements of ETFs as criteria for inclusion and weighting in the indexes.

3

8.      With respect to the Advisory Services, Debtor F-Squared Capital, LLC ("**F-Squared Capital**") provides investment advisory services related to various index products on a discretionary basis for the SMAs.  For the SMA's portfolio, F-Squared Capital seeks to replicate one or more of the AlphaSector Indexes.  Debtors F-Squared Investments, LLC ("**F-Squared Investments**"), F-Squared Institutional Advisors, LLC ("**F-Squared Institutional**") and F-Squared Retirement Solutions ("**F-Squared Retirement**") provide various index products on a non-discretionary basis to unaffiliated third parties, and separately provide discretionary investment advisory services based on those index products to various SMA clients.  Debtor F-Squared Solutions, LLC ("**F-Squared Solutions**") provides investment advisory services to institutional unaffiliated third parties and currently has no funded clients.

9.      Debtor Active Index Solutions, LLC ("**Active Index**") creates the indexes used by the other Debtors and licenses such indexes to the other Debtors.   The license agreement allows the Debtors to use such indexes with respect to their investment advisory services.

10.      Debtor AlphaSector LLS GP 1, LLC ("**AlphaSector**") is the sole general partner and holds a limited partnership interest in a non-Debtor, F-Squared U.S. Sector Opportunities Fund, LP (the "**Hedge Fund**").  AlphaSector is one of many limited partners in the Hedge Fund. As the general partner, AlphaSector manages the Hedge Fund but has the ability, pursuant to the terms of the limited partnership agreement of the Hedge Fund, to delegate those responsibilities and, in fact, has delegated such responsibilities to Debtor F-Squared Alternative Investments, LLC ("**AIS**").  AIS, as the investment manager and pursuant to the terms of an investment management agreement, invests and reinvests the Hedge Fund's capital based on quantitative trading models and strategies for different types of securities.  AlphaSector and AIS, in connection with their roles as general partner and investment manager of the Hedge Fund, are

4

entitled to receive management and other performance based fees, although such fees have been minimal.  The Hedge Fund is also an important marketing asset for the Debtors.  Specifically, the Hedge Fund, which invests its funds based on the Debtors' investment strategies, allows the Debtors to demonstrate the success of such strategies based on the actual track record of the Hedge Fund.

### B.    Capital Structure

11.    As of the Petition Date, the Debtors had total outstanding liabilities and other obligations of approximately $15 million and approximately 28.9 million units of outstanding preferred and common LLC units.  A detailed discussion of the Debtors' capital structure, including their various debt obligations, is set forth below.

### i.    Debt Structure

12.    As of the Petition Date, the Debtors' have no funded secured debt.[3]  Many of the Debtors' liabilities are unsecured and were incurred in the ordinary course of business.  The three most significant categories of claims are as follows:

13.    First, the Debtors have received indemnification claims from their former Chief Executive Officer, Howard B. Present, stemming from a proceeding by the Securities and Exchange Commission (the "**SEC**"), which is discussed further below.  The Debtors have reason to believe that in 2015 alone, the potential indemnification claims will approach, albeit be less than $10 million, with potential 2016 indemnification claims not yet estimated.  The indemnification claim is disputed, contingent and in part unliquidated.

14.    Second, the Debtors have lease obligations of $2.7 million per year, which is disproportionate for the business in its current configuration.  Third, the Debtors have significant

---

[3] One of the Debtor's landlords has a letter of credit in its favor and one lease may be deemed a secured transaction.

RLF1 12231726v.4

severance obligations as a result of their prepetition reductions in workforce.  Because severance obligations are three or six months of pre-severance salary (depending on the employee contract), unpaid severance obligations total approximately $1.3 million.

ii.    *Corporate Structure*

15.    F-Squared is a holding company that owns 100% of the interests in Debtors F-Squared Institutional, AIS, F-Squared Investments, F-Squared Retirement, F-Squared Solutions and F-Squared Capital.  Debtor F-Squared Investments, Inc. owns 100% of the interests in Debtor Active Index.  Debtor AIS owns 100% of the Interests in Debtor AlphaSector.   As discussed further above, Debtor AlphaSector is the general partner and a limited partner of the Hedge Fund.  A detailed organizational chart of the Debtors is attached hereto as Exhibit A.

16.    F-Squared has issued both preferred LLC units (8,218,842 outstanding units) and common units (20,656,824 outstanding units) to individuals and corporate entities.  There is no controlling or majority unitholder.   Approximately 32 of the Debtors' former employees collectively hold approximately 46% of the outstanding units.  F-Squared's board members and current employees own approximately 31% of the outstanding units in the aggregate.  Individual investors hold the remaining 23% of outstanding units.  The preferred units have a liquidation preference, amounting to $4.5 million, and are convertible into common units under certain circumstances.  Those individuals and entities, and their percentage ownership in each type of unit, are set forth in the F-Squared's Chapter 11 petition.

C.    **Events Leading Up to These Chapter 11 Cases**

i.    *The SEC Settlement*

17.    On December 22, 2014, the Debtors agreed to a settlement (the "**SEC Settlement**") of an administrative cease-and-desist proceeding with the SEC.  The subject of the proceeding was the advertising of the Company's performance track record for the period

6

between April 2001 to September 2008; the SEC charged that the track record was materially inflated, hypothetical and back-tested.    Pursuant to the SEC Settlement, the Debtors acknowledged that their conduct violated federal securities laws, consented to strict compliance review and paid both a $5 million penalty and $30 million in disgorged profits.    As a result of the SEC Settlement, the Debtors are no longer the subject to any enforcement action by the SEC.

18.    The Debtors' former Chief Executive Officer, Howard B. Present, remains subject of a related SEC proceeding.    Mr. Present resigned as the Debtors' CEO in November 2014, a month before the SEC Settlement.    As of the Petition Date, Mr. Present has not settled with the SEC and has elected to proceed to trial.    Pursuant to indemnification provisions contained in the Debtors' corporate documents, the Debtors are required to indemnify Mr. Present for his reasonable legal costs in connection with his SEC proceeding, subject to the limitations set forth therein.    Mr. Present's SEC proceeding is expected to go to trial in early 2017.

19.    The weight of the SEC Settlement and related expenses caused significant financial hardship on the Debtors.    In addition to the payment of the $5 million fine and $30 million disgorgement, in 2014 alone, the Debtors recognized approximately $17.2 million in legal costs mostly related to the SEC proceeding.    The Debtors only recovered approximately $10 million of these legal costs from their D&O insurance policy.    In addition, the Debtors have the continuing obligation to indemnify Mr. Present to the extent set forth in their corporate documents.    As set forth above, the Debtors have reason to believe that legal costs in 2015 alone will approach, albeit be less than, $10 million and the legal costs for 2016 have not yet been estimated.

*ii.    Other Events*

20.    Until the SEC proceeding, the Debtors were outpacing all of their rivals in AUA, *i.e.*, the market value of assets that an investment company manages on behalf of its investors.

7

As a result of the SEC proceeding, certain of the Debtors' distribution customers removed the AlphaSector suite from their platforms.  Specifically, in early 2015, the Debtors were notified by four of their distribution customers representing $4.3 billion of AUA that as of March 31, 2015 they were removing their assets from the Debtors' management services.  In addition, in early May 2015, Virtus Investment Partners, Inc. (**"Virtus"**) terminated its relationship with the Debtors.  The Debtors were a sub-advisor on several popular mutual funds from Virtus.  The Debtors are fearful that without the consummation of the Sale in a quick and efficient manner in these Chapter 11 Cases, they are at risk of losing additional customers.

21.    As a result of the mounting legal expenses and loss of customers, the Debtors began taking steps to minimize their expenses.  In March 2015, the Debtors reduced their workforce from 162 employees to 117 employees, resulting in an approximately $4.7 million reduction in run-rate expenses.  As a result of the reduction in the workforce the severance obligations, the Debtors incurred approximately $1.3 million in severance costs.

22.    Further, the Debtors incur significant lease obligations related to their Wellesley, Massachusetts headquarters.  Given the substantial reduction in work force, these obligations no longer are right-sized for the Company's needs.  The Debtors anticipate reducing this large expense in connection with their Chapter 11 Cases.

23.    On May 19, 2015, I was retained to advise the Debtors in their cost minimization efforts as well advise in their evaluation of strategic alternatives described below, and any other restructuring issues that arise.

### iii.    Pre-Petition Marketing Efforts

24.    Given the economic effects of the SEC Settlement and loss of customers, F-Squared retained PL Advisors (**"PL Advisors"**) as its investment banker and financial advisor in March 2015.  PL Advisors' initial charge was to raise capital, but allowed for possible alternative

transactions.    PL Advisors identified financial and strategic investors (collectively, the "**Interested Parties**") to garner interest in pursuing a recapitalization in the Debtors.

25.    Commencing on April 9, 2015, PL Advisors contacted and/or sent teasers to fifty-one (51) Interested Parties.    Twenty-six (26) Interested Parties executed non-disclosure agreements by May 1, 2015.    On or around May 1, 2015, PL Advisors sent a letter to all Interested Parties, excluding those Interested Parties that had indicated they would not be submitting a bid, requesting all non-binding letters of intent by May 18, 2015 at 12:00 p.m. (ET).

26.    On May 11, 2015, Virtus terminated its relationship with the Debtors.    As a result of the Virtus termination, the Debtors' board determined that a sale of the Debtors' assets rather than a capital raise was likely to maximize value.    Due to further marketing, five (5) additional non-disclosure agreements were executed after the Virtus termination, resulting in a total of thirty-one (31) non-disclosure agreements executed by Interested Parties.    On May 15, 2015, PL Advisors updated the confidential information memorandum to account for the Virtus termination and distributed it to thirteen (13) Interested Parties that remained interested in a transaction with the Debtors.

27.    PL Advisors received its first letter of intent ("**LOI**") on May 18, 2015.    In all, four LOI's were received.    All Interested Parties that submitted an LOI were given access to the electronic dataroom.

28.    Based upon feedback received by certain bidders and an analysis of the evolving landscape, on or about June 1, 2015, the Debtors' board made the decision to pursue a sale process pursuant to Section 363 of the Bankruptcy Code to maximize value.    PL Advisors informed all Interested Parties still engaged in the transaction to revise their bids to account for a Section 363 sale process.    Four (4) Interested Parties submitted LOIs incorporating a Section 363

sale process.  On June 12, 2015, after reviewing and carefully considering the revised LOIs, the Debtors, in consultation with their advisors, determined that PL Advisors should request that each bidder submit their best and final letter of intent ("**Best and Final LOI**").  After reviewing and carefully considering the Best and Final LOIs received, the Debtors determined, in consultation with their advisors, that the Best and Final LOI submitted by Cedar Capital was the highest or otherwise best offer for the Debtors' assets.  The other three bidders were informed that they were not chosen as the highest best offer, and that the Debtors had not entered into an exclusivity arrangement with the stalking horse bidder.  In fact, during the process of negotiating the Stalking Horse Agreement with Purchaser, the Debtors went back to a previous bidder to see if it was still interested in purchasing the assets.  The other bidder told the Debtors that it was not interested unless the Debtors agreed to certain conditions that were plainly inappropriate.

29.    On July 3, 2015, the Debtors and Broadmeadow entered into a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") pursuant to which the Debtors will sell substantially all of their assets to Broadmeadow in exchange for up to $5 million cash plus earn-out payments on the first and second anniversary of the closing date, determined by a formula that is subject to the amount of AUA at the end of such period.  The $5 million is subject to reduction if AUA that can be transferred pursuant to the Stalking Horse Agreement is below $2 billion.

30.    Given the centrality of AUA to both the initial cash payment at close and the earn-out, the Debtors believe it is essential for the preservation of value to conduct the Sale in an orderly and efficient manner in order to retain AUA during these Chapter 11 Cases.  An expedited sale process is the only likely path to retaining AUA and therefore maximizing value under the Stalking Horse Agreement.

31.     The Debtors' business is conducted through advisory agreements and investment advisory agreement with their clients.  The Stalking Horse Agreement requires that the Debtors obtain affirmative or negative notice consents from these clients (the "**AUA Consents**") depending on the requirements of the clients' investment advisory agreements.  The Debtors are required to obtain $1 billion of AUA Consents prior to closing.  Because Broadmeadow will not be confirmed as the winning bidder until the auction, the timing of contacting these clients to obtain their consent might not be able to be achieved prior to the sale hearing.  Accordingly, it is likely that the sale will not close for some period after the Sale Hearing.  As a result, it is essential that sale process move as efficiently and quickly as possible to enable the Debtors to obtain in the required AUA Consents while retaining customers, in order to maximize value for the Debtors' estates.

32.     Under the Stalking Horse Agreement, Broadmeadow has agreed to act as the stalking horse bidder and to subject the Stalking Horse Agreement to higher and better offers in exchange for certain bidding protections.  The Debtors, with the assistance of PL Advisors, will continue their marketing efforts post-petition.

33.     The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids.  The Stalking Horse Agreement allows for the Debtors' creditors to benefit from the potential upside captured by the earn-out and preserves the jobs of certain of the Debtors' employees.

34.     The Debtors intend to file a motion (the "**Sale Motion**") on the Petition Date seeking, *inter alia*: (i) the entry of an order (a) establishing bidding and auction procedures (the "**Bidding Procedures**") in connection with the sale of the Debtors' assets, (b) approving

11

proposed bid protections, including the payment, if triggered, of a $250,000 break-up fee and actual and reasonable out of pocket legal and other fees and expenses capped at $250,000, (c) scheduling an auction (the "**Auction**") and setting a date and time for the sale hearing (the "**Sale Hearing**") and (d) establishing procedures for noticing and determining cure amounts for contracts and leases to be assumed and assigned in connection with the sale transaction; and (ii) at the Sale Hearing, subject to the results of the Auction, the entry of an order (a) approving and authorizing a sale to the winning bidder, (b) authorizing the assumption and assignment of certain contracts and leases and (c) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement.

35.     With the paramount considerations regarding timing discussed herein and taking into account the prepetition marketing process discussed above, as well as the need for the Debtors to retain as many customers through this process in order to maximize value, the Sale Motion requests the following timeline:

| Event | Deadline |
| --- | --- |
| Proposed Bidding Procedures Hearing……... | On or about July 29, 2015 |
| Proposed Bid Deadline ……………………. | On or about August 18, 2015 |
| Auction……………………………………… | On or about August 19, 2015 |
| Sale Hearing………………………..….... | On or about August 24, 2015 |
| Closing……………………………………… | No later than September 25, 2015 |

36.     The Bidding Procedures, including the proposed timeline, are designed to maximize the value received for the Debtors' assets and to facilitate a fair and open process in which all interested bidders may participate.  Given the Debtors' prepetition marketing efforts and the significant information compiled in the schedules to the Stalking Horse Agreement, the Debtors believe that the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the assets.  The most likely competing bidders are

among those who previously submitted a letter of intent.  Thus, these parties need minimal time to submit competing bids.  If new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture and bidders can utilize the Stalking Horse Agreement and its schedules.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Debtors' assets.

<em>iv.      Anticipated Chapter 11 Process</em>

37.      As set forth above, the Debtors have determined that value will be maximized by commencing these Chapter 11 Cases and continuing an orderly sale process.  While the pre-petition solicitation process already was extensive, the commencement of these Chapter 11 Cases and the implementation of a Court supervised sale process allows other bidders to make competing bids and therefor to maximize the value of their estates for the benefit of the Debtors' stakeholders.

38.      A sale pursuant to Section 363 of the Bankruptcy Code is the most appropriate course of action for the Debtors.  As set forth above, if the proposed Sale is consummated, Broadmeadow will purchase substantially all of the Debtors' assets.  The Debtors have adequate financial and human resources to maintain their business as a going concern throughout these Chapter 11 Cases in order to maximize value for their estates and creditors.  In addition, the proposed Sale to Broadmeadow is in the best interest of the Debtors' estates and essential in maintaining their relationship with distribution customers.  Specifically, Broadmeadow is knowledgeable about the Debtors' business and the needs of their customers, because it is a quantitative asset manager with a significant presence in Boston, like the Debtors.  Broadmeadow's parent, Cedar Capital, is providing a guaranty of the payment and performance of Broadmeadow's obligations under the Stalking Horse Agreement.  Moreover, Cedar Capital

13

has strong capital resources with the backing of two premier financial services sponsors, FTV and LLR Capital.  Cedar Capital delivers innovative investment solutions, primarily via financial advisors, through its affiliates, providing a single point of access to multiple, diversified and unique investment strategies.  In other words, Broadmeadow knows this business.  The Debtors believe that this fact will be helpful in encouraging their clients to stick with the Debtors during the sale process.  That, in turn, inures to the benefit of the estates in maximizing recovery under the Stalking Horse Agreement, because levels of recovery for both the payment at closing and the earn-out are tied to AUA.

39.     The proposed sale process will allow the Debtors to maintain their day to day operations with their customers with very little, if any, disruptions.  The lack of disruption in the Debtors' operations will enable the Debtors to attempt to maintain AUM, which as set forth above is crucial to the potential recoveries to stakeholders through the earn-out contemplated in the Stalking Horse Agreement.  In the absence of a sale transaction conducted in accordance with such timeline, the Debtors face a deterioration in the value of the business and the value of the Stalking Horse Agreement.  The Debtors do not believe that the Sale could be consummated outside of these bankruptcy proceedings.  Among other reasons, Broadmeadow requested that the Sale be consummated through a process pursuant to Section 363 of the Bankruptcy Code.  Accordingly, the Debtors commenced these Chapter 11 Cases.

## PART II

40.     In furtherance of the reorganization of the Debtors through a sale of all or substantially all of the Debtors' assets, the Debtors are seeking approval of the First Day Motions and related orders (the "**Proposed Orders**").

41.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto, and the facts set forth therein are true and correct to the best of my knowledge,

14

information, and belief.  Moreover, I believe that the relief sought in each of the First Day

Motions (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11

with minimum disruption to their business or loss of productivity or value and (b) constitutes a

critical element in the Debtors' being able to successfully maximize value for the benefit of their

estates.

### A.    Joint Administration Motion

42.    Pursuant to this motion (the "**Joint Administration Motion**"), the Debtors

request the joint administration of their chapter 11 cases, nine (9) in total, for procedural

purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11

Cases will affect all of the Debtors.  The joint administration of these cases will avoid the

unnecessary time and expense of duplicate motions, applications and orders, thereby saving

considerable time and expense for the Debtors and resulting in substantial savings for their

estate.

### B.    Application to Appoint BMC Group, Inc. as Claims Agent

43.    The Debtors filed an application (the "**Section 156(c) Application**")

contemporaneously herewith to retain BMC Group, Inc. ("**BMC**"), as claims, noticing,

soliciting, and balloting agent pursuant to Section 156(c) of title 28 of the United States Code

and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "**Local Rules**").  BMC is a bankruptcy

administrator that specializes in providing comprehensive chapter 11 administrative services,

including noticing, claims processing, balloting, and other related services critical to the effective

administration of chapter 11 cases.  Appointing BMC as the claims and noticing agent in these

Chapter 11 Cases will relieve the administrative burden on the Clerk of the Court for the District

of Delaware (the "**Clerk**").

15

44.     The Debtors' selection of BMC to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that BMC's rates are competitive and reasonable given BMC's quality of services and expertise.  The Section 156(c) Application pertains only to the work to be performed by BMC under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by BMC outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof.  A separate retention application addressing BMC's services beyond Section 156(c) of the Bankruptcy Code will be filed shortly.

### C.     Employee Motion

45.     Pursuant to this motion (the "**Employee Motion**"), the Debtors seek entry of interim and final orders (i) authorizing the Debtors to pay certain prepetition wages, salaries and other compensation, expense allowances and reimbursements, and employee benefits; (ii) confirming the Debtors' right to continue post-petition, in the ordinary course of business, the employee-related plans, programs and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; and (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks.

46.     Specifically, the Debtors seek the authorization to honor and continue prepetition workforce programs, including (i) wages, salaries, vacation pay, severance, other accrued compensation, (ii) reimbursement of business, travel and other expenses, and (iii) benefits in the

16

form of health and dental insurance, health savings accounts, orthodontics coverage, continuation coverage under COBRA, basis term life insurance, accidental death and dismemberment insurance, long-term disability, and other miscellaneous benefits provided to Employees in the ordinary course of business. The Debtors request that the Court confirm their right to continue each of the workforce programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such workforce programs were in effect immediately prior to the filing of these cases and to make payments in connection with expenses incurred in the post-petition administration of any workforce program.

47. The Debtors also seek authorization to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the prepetition workforce obligations including, but not limited to, all withholding taxes, federal social security, and state disability plan premiums. In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from the employees' paychecks by the Debtors for payments on behalf of the Employees for savings programs (including 401(k) plans), benefit plans, insurance programs, and other similar programs and plans.

48. The Debtors additionally request that the Court authorize them to issue new post-petition checks to replace any checks that may be dishonored and to reimburse any expenses that recipients of checks on account of any workforce programs may incur as a result of the dishonoring of any prepetition check.

D.    **Customer Program Motion**

49. Pursuant to this motion (the "**Customer Program Motion**"), the Debtors seek entry of an order authorizing, but not directing, the Debtors (a) to honor prepetition obligations pursuant to a certain customer program (the "**Customer Program**" and obligations arising thereunder, collectively, the "**Customer Obligations**") and (b) to otherwise continue, and honor

17

postpetition obligations under, the Customer Program in the ordinary course of business during the pendency of the Chapter 11 Cases.

50.     Prior to the Petition Date, and in the ordinary course of business, the Debtors entered into contracts with customers to provide advisement services.  Pursuant to the contracts, the customers paid fees in advance of receiving the Debtors' services.  The fees were based on the amount of assets under the Debtors' advisement; however, to the extent the amount of a particular customer's assets decreased while under the Debtors' advisement, the Debtors, in the ordinary course of business, issued a refund to that customer.  Through the refund, the Debtors remitted unearned fees that the customer had advanced prior to receiving the Debtors' services.  The Debtors implemented the Customer Program to ensure customer satisfaction, develop and sustain customer relationships and loyalty, and generate goodwill.

51.     Prior to the Petition Date, the Debtors issued check refunds pursuant to the Customer Program in the aggregate amount of $35,000.00.  By the Motion, the Debtors seek the authority, but not the direction, to re-issue, if necessary, any check refunds that customers did not or were unable to process prior to the Petition Date.

52.     Additionally, as of the Petition Date, the Debtors have unpaid customer refund obligations in the aggregate amount of $20,00.00.  By the Motion, the Debtors seek the authority, but not the direction, to satisfy these obligations, continue and maintain the Customer Program, and satisfy any postpetition obligations throughout the pendency of the Chapter 11 Cases.

53.     I believe the relief sought in this Motion is crucial in order maintain our goodwill with our clients to aid in our retention of clients.

### E.     Utilities Motion

54.     Pursuant to this motion (the "**Utilities Motion**"), the Debtors request entry of for entry of interim and final orders, under Section 366 of the Bankruptcy Code, (i) prohibiting the

18

Debtors' utility service providers from altering, refusing, or discontinuing service, (ii) approving an adequate assurance deposit as adequate assurance of postpetition payment to the utilities, and (iii) establishing procedures for resolving any subsequent requests by the utilities for additional adequate assurance of payment.

55.     Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $3,354.00 (which is approximately fifty percent (50%) of the estimated monthly cost of the utility services, based on historical averages over the prior twelve (12) months) into a newly-created segregated, interest-bearing account, as adequate assurance of postpetition payment to the utility companies pursuant to Section 366(b) of the Bankruptcy Code, (b) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to utility companies, and (c) prohibiting the utility companies from altering, refusing, or discontinuing services to the Debtors except as may be permitted by the proposed procedures.

56.     As of the Petition Date, approximately three (3) utility companies provide utility services to the Debtors at various locations through approximately eight (8) accounts.  The utility companies service the Debtors' offices in two (2) locations, the office located in Wellesley, Massachusetts and the office located Ewing, New Jersey.  On average, prior to the Petition Date, the Debtors were billed approximately $6,708.00 each month for utility costs.

**F.      Cash Management Motion**

57.     The Debtors also have filed a motion (the "**Cash Management Motion**"), pursuant to sections 105(a), 345(b) and 363(c) of the Bankruptcy Code, requesting the entry of an order: (a) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system; (b) granting the Debtors a waiver of certain requirements of

the United States Trustee; and (c) granting an extension of forty-five (45) days for the Debtors to comply with the requirements of Section 345 of the Bankruptcy Code.

58.    In the ordinary course of their business, the Debtors maintain a cash management system (the "**Cash Management System**") that includes operating accounts, related sub-accounts and a restricted account at People's United Bank.  Additionally, as part of their overall Cash Management System and business model, the Debtors maintain the following investment accounts and vehicles: the Experimental Accounts, a limited partner interest in the Hedge Fund, and a House Account (each of which as more fully described in the Cash Management Motion).

59.    The continued use of the Cash Management System during the pendency of these Chapter 11 Cases is essential to the Debtors' business operations and their goal of maximizing value for the benefit of all parties in interest.  Requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens and cause undue disruption.  Any such disruption would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value for the benefit of creditors and other parties in interest.  Moreover, such a disruption would be wholly unnecessary insofar as the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements.  Maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates and all interested parties.

60.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event that the Debtors generate new checks during the pendency of these cases other than from

their existing stock of checks, such checks will include a legend with the designation "Debtor-in-Possession."   In addition, with respect to checks which the Debtors or their agents print themselves, the Debtors will begin printing the "Debtor in Possession" legend and the bankruptcy case number on such items within ten (10) days of the date of entry of an order approving the Cash Management Motion.   The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) without reference to the Debtors' status as debtors in possession.

61.    Also, by the Cash Management Motion, the Debtors seek a forty-five (45) day extension of the time to comply with Section 345(b) of the Bankruptcy Code, without prejudice to the Debtors' ability to seek a further extension (upon agreement with the United States Trustee) or a waiver of those requirements.  During the extension period, the Debtors propose to engage the United States Trustee in discussions to determine if compliance with Section 345(b) is necessary under the circumstances of these Chapter 11 Cases.  The Debtors believe that the benefits of the requested extension far outweigh any harm to the estate.

62.    In sum, I believe that the continued operation of the Debtors' Cash Management System is in the best interests of the Debtors' estates and creditors, will avoid immediate and irreparable harm to the Debtors, and is both necessary and appropriate to further the reorganization policy of Chapter 11.

## CONCLUSION

63.    The Debtors' ultimate goal in these Chapter 11 Cases is to maximize the value of their estates for the benefit of their stakeholders.  A sale of the Debtors' assets via Section 363 is the best way to accomplish this.  In the near term, however, to minimize any loss of value to their business, the Debtors' immediate objective is to promote stability and maintain ordinary course operations during the early stages of these Chapter 11 Cases, with as little disruption to

21

operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful sale of the Debtors' business will be substantially enhanced.

64.      I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2015.

F-Squared Investment Management, LLC, *et al.*
*Debtors and Debtors in Possession*

David N. Phelps
Chief Restructuring Officer

**EXHIBIT A**



**F-Squared Investments Organizational Chart**