# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| F-Squared Investment Management, LLC, *et al.*[1] | Case No. 15-_____ (_____) |
|  | (Joint Administration Requested) |
| Debtors. |  |

### DEBTORS' MOTION TO (A) ESTABLISH BIDDING PROCEDURES RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, APPROVE RELATED BID PROTECTIONS AND ESTABLISH NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS, AND (B) APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The debtors and debtors in possession (collectively, the "**Debtors**" or the "**Sellers**", as applicable) hereby move, pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 and Fed. R. Bankr. Proc. 2002, 6004 and 6006 for entry of two orders. The first, the "**Bidding Procedures Order**", attached hereto as **Exhibit A**, requests that the Court (A) establish bidding and auction procedures (the "**Bidding Procedures**") in connection with the sale of substantially all of the Debtors' assets (the "**Assets**") free and clear of all claims and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "**Interests**"), except to the extent identified in a Winning Bidder's (as defined below) asset purchase agreement; (B) approve the proposed bid protections, including the termination fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**"), to Broadmeadow Capital, LLC (the "**Purchaser**" or the "**Stalking Horse**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788).  The Debtors' address is Wellesley Office Park, 80 William Street, Suite 400, Wellesley, Massachusetts 02481.

**Bidder**"), as applicable, a wholly owned subsidiary of Cedar Capital, LLC ("**Cedar Capital**"), in accordance with the Asset Purchase Agreement dated July 3, 2015 (the "**Stalking Horse Agreement**"),[2] a copy of which is attached hereto as **Exhibit B**; (C) schedule an auction (the "**Auction**") and set a date and time for a sale hearing (the "**Sale Hearing**") for the sale of the Assets (the "**Sale**"), and approve the form and manner of notice thereof; (D) establish procedures for noticing and determining cure amounts for executory contracts ("**Executory Contracts**") and unexpired leases ("**Leases**") to be assumed and assigned in connection with the Sale; and (E) grant certain related relief.

The second order, the "**Sale Order**", attached hereto as **Exhibit C**, requests that, at the Sale Hearing, subject to the results of the Auction, the Court (A) approve and authorize the Sale, free and clear of all Interests, except to the extent set forth in the Winning Bidder's (as defined below) asset purchase agreement; and (B) authorize the assumption and assignment of certain Executory Contracts and Leases.  In support hereof, the Debtors respectfully represent:

### JURISDICTION

1.        This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.[3]

### GENERAL BACKGROUND

2.        On July 8, 2015 (the "**Petition Date**"), the Debtors filed voluntary chapter 11 petitions commencing these cases.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Additional information regarding the Debtors' business and the background

---

[2]        Unless otherwise indicated, capitalized terms that are used herein and not otherwise defined shall have the meanings assigned to such terms in the Stalking Horse Agreement.
[3]        The Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by this Court.

relating to the events leading up to these cases can be found in the *Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## BACKGROUND ON THE SALE

**A.     The Marketing Process and the Stalking Horse Agreement**

3.      As described in greater detail in the First Day Declaration, given the economic effects of a settlement with the Securities and Exchange Commission (the "**SEC**") and loss of customers, F-Squared retained PL Advisors ("**PL Advisors**") as its investment banker and financial advisor in March 2015.  PL Advisor's initial charge was to raise capital, but allowed for possible alternative transactions.   PL Advisors identified financial and strategic investors (collectively, the "**Interested Parties**") to garner interest in pursuing a recapitalization in the Debtors.

4.      Commencing on April 9, 2015, PL Advisors contacted and/or sent teasers to fifty one (51) Interested Parties.   Twenty-six (26) Interested Parties executed non-disclosure agreements by May 1, 2015.  On or around May 1, 2015, PL Advisors sent a letter to all Interested Parties, excluding those Interested Parties that had indicated they would not be submitting a bid, requesting all non-binding letters of intent by May 18, 2015 at 12:00 p.m. (ET).

5.      On May 11, 2015, Virtus Investment Partners, Inc. ("**Virtus**") terminated its relationship with the Debtors.   As a result of the Virtus termination, the Debtors' board determined that a sale of the Debtors' assets rather than a capital raise was likely to maximize value.  Due to further marketing, five (5) additional non-disclosure agreements were executed after the Virtus termination, resulting in a total of thirty-one (31) non-disclosure agreements executed by Interested Parties.   On May 15, 2015, PL Advisors updated the confidential

information memorandum to account for the Virtus termination and distributed it to thirteen (13) Interested Parties that remained interested in a transaction with the Debtors.

6.      PL Advisors received its first letter of intent ("**LOI**") on May 18, 2015.  In all, four LOI's were received.  All Interested Parties that submitted an LOI were given access to an electronic dataroom.

7.      Based upon feedback received by certain bidders and an analysis of the evolving landscape, on or about June 1, 2015, the Debtors' board made the decision to pursue a sale process pursuant to Section 363 of the Bankruptcy Code to maximize value.  PL Advisors informed all Interested Parties still engaged in the transaction to revise their bids to account for a Section 363 sale process.  Four (4) Interested Parties submitted LOIs incorporating a Section 363 sale process.  On June 12, 2015, after reviewing and carefully considering the revised LOIs, the Debtors, in consultation with their advisors, determined that PL Advisors should request that each bidder submit their best and final letter of intent ("**Best and Final LOI**").  After reviewing and carefully considering the Best and Final LOIs received, the Debtors determined, in consultation with their advisors, that the Best and Final LOI submitted by Cedar Capital was the highest or otherwise best offer for the Debtors' assets.  The other three bidders were informed that they were not chosen as the highest best offer, and that the Debtors had <u>not</u> entered into an exclusivity arrangement with the stalking horse bidder.  In fact, during the process of negotiating the Stalking Horse Agreement with Purchaser, the Debtors went back to a previous bidder to see if it was still interested in purchasing the assets.  The other bidder told the Debtors that it was not interested unless the Debtors agreed to certain conditions that were plainly inappropriate.

8.      On July 3, 2015, the Debtors and the Purchaser entered into the Stalking Horse Agreement, pursuant to which the Debtors will sell substantially all of their assets to the

Purchaser in exchange up to $5 million cash plus earn-out payments on the first and second anniversary of the closing date, determined by a formula that is subject to the amount of assets under advisement ("**AUA**") at the end of such period.  The $5 million is subject to reduction if AUA that can be transferred pursuant to the Stalking Horse Agreement is below $2 billion.

9.      The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids.  The Stalking Horse Agreement allows for the Debtors' creditors to benefit from the potential upside captured by the earn-out and preserves the jobs of certain of the Debtors' employees.

10.      In addition, the proposed Sale to the Purchaser is in the best interest of the Debtors' estates and is essential in maintaining their relationship with distribution customers. Specifically, the Purchaser is knowledgeable about the Debtors' business and the needs of their customers, because it is a quantitative asset manager with a significant presence in Boston, like the Debtors.  The Purchaser's parent, Cedar Capital, is providing a guaranty of the payment and performance of Purchaser's obligations under the Stalking Horse Agreement.  Moreover, Cedar Capital has strong capital resources with the backing of two premier financial services sponsors, FTV and LLR Capital.  Cedar Capital delivers innovative investment solutions, primarily via financial advisors, through its affiliates, providing a single point of access to multiple, diversified and unique investment strategies.  In other words, the Purchaser knows this business.  The Debtors believe that this fact will be helpful in encouraging their clients to stick with the Debtors during the sale process because of this key fact.  That, in turn, inures to the benefit of the estates in maximizing recovery under the Stalking Horse Agreement, because levels of recovery for both the payment of closing and the earn-out are tied to AUA.

**B.**     **Proposed Timeline for Sale of Assets**

11.     Given the centrality of AUA to both the initial cash payment at close and the earn-out, the Debtors believe it is essential for the preservation of value to conduct the Sale in an orderly and efficient manner in order to retain AUA during these chapter 11 cases.  An expedited sale is the only likely path to retaining AUA and therefore maximizing value under the Stalking Horse Agreement.

12.     The Debtors' business is conducted through advisory agreements and investment advisory agreements with their clients.  The Stalking Horse Agreement requires that the Debtors obtain affirmative or negative notice consents from these clients (the "**AUA Consents**") depending on the requirements of the clients' investment advisory agreements.  The Debtors are required to obtain $1 billion of AUA Consents prior to closing.  Because Broadmeadow will not be confirmed as the winning bidder until the auction, the timing of contacting these clients to obtain their consent might not be able to be achieved prior to the sale hearing.   In addition, some clients may be reluctant to provide an AUA Consent until the Winning Bidder is confirmed.  Accordingly, it is likely that the sale won't close for some period after the Sale Hearing.  As a result, it is essential that sale process move as efficiently and quickly as possible to enable Debtors to obtain in the required AUA Consents while retaining customers, in order to maximize value for the Debtors' estates.

13.     With these paramount considerations, and taking into account the prepetition marketing process discussed above, as well as the need for the Debtors to retain as many customers through this process in order to maximize value, the Debtors request the following timeline for conducting the Sale process:

RLF1 12340331v.3

| Event | Deadline |
|---|---|
| Proposed Bidding Procedures Hearing……... | On or about July 29, 2015 |
| Proposed Bid Deadline …………………….. | On or about August 18, 2015 |
| Auction……………………………………… | On or about August 19, 2015 |
| Sale Hearing…………………………..…..... | On or about August 24, 2015 |
| Closing……………………………………… | No later than September 25, 2015 |

14.     Given the Debtors' prepetition marketing efforts and the significant information compiled in the Schedules to the Stalking Horse Agreement, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Assets. The most likely competing bidders are among those who previously submitted a letter of intent. Thus, these parties need minimal time to submit competing bids.  If new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture and bidders can utilize the Stalking Horse Agreement and its Schedules.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Assets.

**C.**     **Terms of the Stalking Horse Agreement**

15.     A summary of the pertinent terms of the Stalking Horse Agreement, including the terms to be highlighted pursuant to Local Rule 6004-1, is as follows:[4]

- **Assets**:  Section 2.1 of the Stalking Horse Agreement lists the Purchased Assets, which are comprised of substantially all of the Debtor's assets (excluding the Excluded Assets).

- **Assumed Liabilities**:  As set forth in Section 2.3 of the Stalking Horse Agreement, only certain liabilities will be assumed by the Purchaser, primarily relating to the Seller's Business.  The Purchaser will not assume any of the Excluded Liabilities.

---

[4]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Agreement.

- **Purchase Price**:  Section 3.1(a) of the Stalking Horse Agreement provides that the Purchase Price for the Purchased Assets shall be (a) an amount of cash equal to the (i) the Closing Payment, plus (ii) plus the Investment In Hedge Fund Amount (solely if the requisite number of LP Consents is obtained in accordance with Section 8.3 of the Stalking Horse Agreement), plus (iii) the Investment In Seeded Strategies Amount, plus or minus (iv) the Fee Adjustment Amount, plus or minus (v) the Adjustment Amount plus (vi) the Initial Earn-out Payment, plus (vii) the Final Earn-Out Payment, and (b) the assumption of Assumed Liabilities.

- **Termination and Other Deadlines**:  Section 4.4(a) of the Stalking Horse Agreement allows either Party to terminate the Stalking Horse Agreement if the Closing has not occurred by the Termination Date (which date may be extended until the 60th day following the entry of the Sale Order in the circumstances described in 4.4(a) of the Stalking Horse Agreement).

- **Break-Up Fee and Expense Reimbursement**:  The Break-Up Fee is $250,000 and the Expense Reimbursement includes the actual out-of-pocket documented (to the reasonable satisfaction of the Seller) expenses incurred by the Purchaser in connection with the Transactions, with a cap of $250,000.  Section 7.5 of the Stalking Horse Agreement provides that, subject to Court approval, in the event that (i) the Purchaser is not determined to be the Winning Bidder at the Auction and Seller closes a transaction contemplated by a Competing Bid with another bidder or (ii) Purchaser is the Winning Bidder and Sellers fail to close the Transaction for reasons other than a breach of Purchaser's obligations or representations and warranties in the Stalking Horse Agreement and Sellers close a transaction contemplated by a Competing Bid with another bidder, then Seller shall pay the Purchaser the Break-Up Fee and Expense Reimbursement on the third (3rd) Business Day following the date of the closing of a transaction contemplated by a Competing Bid.

- **Closing Conditions**.  The respective obligations of the Purchaser and the Seller to consummate the closing are subject to the satisfaction or waiver of the closing conditions set forth in Article X of the Stalking Horse Agreement.

- **Good Faith Deposit**.  Pursuant to Section 3.2 of the Stalking Horse Agreement, the Purchaser deposited with Richards, Layton & Finger, P.A., in its capacity as escrow holder, Five Million Dollars ($500,000).

- **Transition Services Agreement.**  The parties anticipate the need for a TSA.

- **Record Retention**.  Section 8.7 of the Stalking Horse Agreement provides that each of the Seller and the Purchaser agree to preserve and keep the

records, or in the case of the Seller, arrange for the preservation and keeping of the records, held by it or their Affiliates relating to the Business for a period of six (6) years from the Closing Date, and shall make such records and personnel available to the other Party, subject to the provisions of Section 8.6 thereof, as may be reasonably required by such Party in connection with, among other things, any insurance claims, Proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates, administering this case, including in connection with any motion or claim objection filed or to be filed by or against the Seller in this case, winding up the Seller, or in order to enable the Seller or the Purchaser to comply with its obligations under the Stalking Horse Agreement and each other agreement, document or instrument contemplated by such agreements.

- **No Successor Liability**.  Paragraph 25 of the Sale Order provides that, except as may be expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities and the Permitted Exceptions, the transfer of the Purchased Assets, including, without limitation, the assumption, assignment and transfer of any Purchased Contract, to the Purchaser shall not cause or result in the Purchaser, any of its Affiliates or subsidiaries, or any of their respective Representatives, having any liability, obligation, or responsibility for, or any Purchased Assets being subject to or being recourse for, any Interest whatsoever, whether arising under any doctrines of successor, transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment, setoff, recoupment, or otherwise.

- **Relief From Bankruptcy Rule 6004(h)**.  Paragraph 30 of the Sale Order provides that the Sale Order will be effective and enforceable immediately upon entry.

## RELIEF REQUESTED

16.     By this Motion, the Debtors seek entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and the Expense Reimbursement in accordance with the Stalking Horse Agreement; (C) scheduling the Auction (if necessary) and a Sale Hearing, and approving the form and manner of notice thereof; and (D) establishing the Cure Procedures (as defined below).

17.     The Debtors request that this Court set the Sale Hearing on or about August 24, 2015.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order (A) approving the Sale, free and clear of all Interests, and (B) authorizing the assumption and assignment of certain Executory Contracts and Leases.

## BASIS FOR RELIEF

### A.     Necessity for Sale

18.     Given the settlement with the SEC, the mounting legal and indemnification expenses and the loss of customers, the Debtors determined that the most effective way to preserve the Debtors' going concern value for the benefit of their stakeholders was through a sale of the Debtors' assets following a thorough marketing process.  The Debtors submit that a Sale of the Assets, along the timeline proposed herein, will achieve such goal.  Indeed, the proposed sale process will allow the Debtors to maintain their day to day operations with their customers with very little, if any, disruption.  The lack of disruption in the Debtors' operations will enable the Debtors to attempt to maintain AUA, which as set forth above is crucial to the potential recoveries to stakeholders through the earn-out contemplated in the Stalking Horse Agreement. In the absence of a sale transaction conducted in accordance with such timeline, the Debtors face a deterioration in the value of the business and the value of the Stalking Horse Agreement.

### B.     The Bidding Procedures[5]

19.     In order to maximize value for the benefit of the Debtors' estates and their stakeholders, the Debtors seek to implement a competitive bidding process that is designed to generate maximum value for the Assets.  As described more fully in the Bidding Procedures,

---

[5]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order.

attached as **Schedule 1** to the Bidding Procedures Order attached hereto as **Exhibit A**, the Debtors seek approval to sell the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

20.    As described more fully in the Bidding Procedures, the Debtors request that competing bids for the Assets be governed by the following procedures:[6]

- **Bid Deadline**.    Any party interested in submitting a bid (a "**Bidder**") must transmit such bid (a "**Bid**") via electronic mail to the parties identified on **Schedule 1** to the Bidding Procedures not later than 5:00 p.m. (prevailing Eastern Time) on August 18, 2015 (the "**Bid Deadline**").

- **Required Bid Materials**.  To constitute a "Qualified Bid", a Bid (other than the Stalking Horse Agreement, which shall constitute a Qualified Bid for all purposes) must be a written irrevocable offer from a Qualified Bidder (as defined below) and provide for the following:

    (i)    **Identification of Potential Bidder**.  Identification of the party submitting the bid (the "**Potential Bidder**") (and any equity holders, in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

    (ii)    **Asset Purchase Agreement**.  An executed copy of an asset purchase agreement providing for the purchase of substantially all of the assets of the Debtors along with a redline marked against the Stalking Horse Agreement reflecting variations from the Stalking Horse Agreement.  The Debtors may consider any bids, including those which may propose alternative transaction structures to the Stalking Horse Agreement.

    (iii)    **Financing**.    Evidence of the Potential Bidder's ability to consummate the transaction and payment of the purchase price in cash at the Closing, including, but not limited to:

        (a)    a signed commitment for any debt or equity financing;

---

[6]    The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

(b)    a bank or other account statement showing the ability of a Potential Bidder to pay cash for the Assets;

(c)    contact names and numbers for verification of financing sources; and

(d)    any additional information or evidence, satisfactory to the Debtors, in their discretion, as requested to validate the ability to fund the Minimum Bid Amount (defined below),

(iv)    **Minimum Bid Amount**. The bid must be higher or otherwise better than the offer of the Stalking Horse Bidder under the Stalking Horse Agreement.  To be higher or otherwise better than the offer of the Stalking Horse Bidder such bid must be valued in an amount that is at least the equivalent of $600,000 over the Closing Payment (the "**Minimum Bid Amount**").[7]

(v)    **Irrevocability of Bid**.  A letter stating that the Potential Bidder's offer is irrevocable and binding until the first business day after the Assets for which the Potential Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Court.

(vi)    **Bid Deposit**.  A cash deposit in the amount of $560,000 by wire transfer or certified or cashier's check, which amount shall be made payable to the Debtors.

(vii)    **Identification of Executory Contracts and Leases**.  The bid shall identify with particularity the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks to receive an assignment and any designation rights it seeks.

(viii)    **No Financing or Diligence Constituencies**.  The bid shall not contain any due diligence or financing contingencies of any kind.

(ix)    **Consent to Jurisdiction**.  The bid shall state that the offering party consents to the jurisdiction of the Court.

(x)    **Corporate Authority**.  The bid shall include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted asset purchase agreement of the Potential Bidder.

---

[7]    The Minimum Bid Amount represents the initial overbid amount of $100,000 plus the Break-Up Fee (which is $250,000) plus the Expense Reimbursement (which, for purposes of determining the Minimum Bid Amount, is $250,000).

    (xi)    **Adequate Assurance Information**.  The bid shall include sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the bidder in connection with the proposed transaction.  The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.

    (xii)    **Other Information.** The bid shall include such other information as may be reasonably requested in writing by the Debtors prior to the Auction.

A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in subparagraphs (i)-(xii) above, and that the Debtors determine, in consultation with the official committee of unsecured creditors (the "**Creditors' Committee**") (if any), is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors) to be able to consummate a sale if selected as the Winning Bidder.  Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder.  Not later than two (2) business days after the Bid Deadline, the Debtors shall determine and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  On or prior to 11:59 p.m. (prevailing Eastern Time) on the day of the Bid Deadline, the Debtors will notify the parties identified on **Schedule 1** to the Bid Procedures and the Stalking Horse Bidder by electronic mail of any extension of the Bid Deadline.  A bid from a Qualified Bidder is a "**Qualified Bid**." No later than three (3) business days after the Bid Deadline, the Debtors shall provide copies of all Qualified Bids (other than the Stalking Horse Bidder's bid) by electronic mail to the parties identified on **Schedule 1** to the Bid Procedures and all Qualified Bidders (including the Stalking Horse Bidder).

- **Minimum Bid Increment**.  Unless otherwise agreed by the Debtors, in consultation with the Creditors' Committee (if any), subsequent bids at the Auction shall not provide consideration of less than $100,000 in excess of the preceding bid.

- **Auction**.  If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the Debtors will conduct the Auction with respect to all or some of the Assets. The Auction shall be conducted at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 at a date and time determined by the Court, or such other place and time as the Debtors, in consultation with the Creditors' Committee (if any), may determine.

C.      **Break-Up Fee and Expense Reimbursement**

21.     All of the Interested Parties that submitted a Best and Final LOI to purchase the Assets required a break-up fee and expense reimbursement.  Presumably, this was because such break-up fee and expense reimbursement provided Interested Parties with some assurance that they will be compensated for the considerable time and expense needed to enter into definitive documentation and the risk that arises from participating in the bidding and subsequent auction process.  Indeed, one Interested Party demanded a combined breakup fee and expenses reimbursement that, even after multiple rounds of negotiation, was substantially more than double the combined breakup fee and expense reimbursement contained in the Stalking Horse Agreement.

22.     Since the Stalking Horse Bidder entered into the LOI, the Stalking Horse Bidder has, in fact, incurred considerable time and expense negotiating the Stalking Horse Agreement. Other potential bidders will benefit from the time and expense that the Stalking Horse Bidder spent negotiating and finalizing such documents. As such, the Debtors believe that providing the Stalking Horse Bidder with the Break-Up Fee and the Expense Reimbursement is appropriate in order to compensate the Stalking Horse Bidder for the time and expense that it incurred in negotiating the definitive documentation and the risk that it may be outbid at the Auction.

23.     In addition to compensating the Stalking Horse Bidder, providing the Stalking Horse Bidder with the Break-Up Fee and the Expense Reimbursement (which the Stalking Horse Bidder required as a condition to entering into the Stalking Horse Agreement) will benefit the Debtors' estates because the purchase price in the Stalking Horse Agreement establishes a floor and promotes more competitive bidding. Specifically, the purchase price in the Stalking Horse Agreement sends a message to the marketplace that the Assets are worth at least such price.

Without that floor, there is a real risk that the ultimate purchase price for the Assets may be undervalued.

**D.**     **Notice of Bidding Procedures, Auction and Sale**

24.     *Notice of Sale Hearing*.   On the date the notice of motion and hearing of this Motion is filed, the Debtors caused this Motion and all exhibits hereto, including the Stalking Horse Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, to be served upon (a) the United States Trustee for the District of Delaware; (b) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petition; (c) counsel to the Stalking Horse Bidder; (d) any party asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtors; (e) each of the Debtors' landlords and any notice parties identified in the Leases; (f) various federal, state, county and city tax and regulatory authorities; (g) all entities known to have expressed an interest in a transaction with respect to the Assets since April 9, 2015 or that have been identified by the Debtors or their advisors as a potential purchaser of the Assets; (h) the SEC; (i) the United States Attorney General/Antitrust Division of the Department of Justice; (j) local and state environmental authorities and the federal Environmental Protection Agency; (k) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Assets; (l) all of the Debtors' creditors, and (m) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

25.     *Notice of Sale*.   Within two (2) days of the entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "**Notice of Auction and Sale Hearing**") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale

Hearing, substantially in the form attached to the Bidding Procedures Order as **Schedule 2**, upon the Sale Notice Parties and all know non-debtor counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the  Stalking Horse Bidder.  In addition, within five (5) days of the entry of the Bidding Procedures Order, the Debtors shall cause a summary version of the Notice of Auction and Sale Hearing to be published on (a) the website of the Debtors' court approved claims agent, BMC Group, Inc. and (ii) in the newspaper publication of *USA Today* (the "**Publication Notice**").

26. *Post-Auction Notice*.  As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, a notice identifying any winning bidder (the "**Winning Bidder**").

### E. **The Cure Procedures**

27. The Debtors request the following procedures (the "**Cure Procedures**") for notifying counterparties to Executory Contracts and Leases of potential Cure Amounts (as defined below) with respect to those Executory Contracts and Leases that the Debtors may seek to assume and assign on the Closing Date.

28. Within two (2) days of the entry of the Bidding Procedures Order, the Debtors will file notices of potential assumption, assignment and/or transfer of the Executory Contracts and Leases listed therein (the "**Designated Executory Contracts**"), substantially in the forms attached to the Bidding Procedures Order as **Schedule 3** (collectively, the "**Notices of Assumption and Assignment**"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "**Contract Notice Parties**").

29. Specifically, the Debtors shall serve all Designated Executory Contracts (other than those Designated Executory Contracts for investment advisory services (collectively, the

16

"**AUA Consent Contracts**")) with a notice substantially in the form attached to the Bidding

Procedures Order as **Schedule 3(a)**.

30.     For those AUA Consent Contracts that require the Debtors to obtain affirmative

AUA Consent (the "**Affirmative AUA Consent Contracts**"), the Debtors shall serve a notice,

substantially in the form attached to the Bidding Procedures Order as **Schedule 3(b)**, on all

Affirmative AUA Consent Contracts that will include a form of written consent that the non-

debtor party to such Affirmative AUA Consent Contract would complete and return to the

Debtors consenting to the assignment of the such Contract to the Purchaser or an Winning

Bidder.  If a party to an Affirmative AUA Consent Contract fails to return a written consent or

expressly objects to the assignment of such Contract, then such Affirmative AUA Consent

Contract shall not be assumed by the Debtors and assigned to the Purchaser or any Winning

Bidder until such consent is received.

31.     For those AUA Consent Contracts that may be assigned by the Debtors upon

negative consent of assignment to such party (the "**Negative AUA Consent Contracts**"), the

Debtors will serve a notice, substantially in the form attached to the Bidding Procedures Order as

**Schedule 3(c)**, on all Negative AUA Consent Contracts that shall set a deadline thirty (30) days

from the service of such Notice of Assumption and Assignment by which the non-debtor party to

a Negative AUA Consent Contract may file an objection to the assumption and assignment of

such Contract.   If a party to a Negative AUA Consent Contract fails to object to the assignment

of such Contract, then such Negative AUA Consent Contract may be assumed by the Debtors

and assigned to the Purchaser or any Winning Bidder without further notice.  If a party to a

Negative AUA Consent Contract objects to the assignment of such Contract to the Purchaser or

any Winning Bidder, then such Negative AUA Consent Contract shall not be assumed by the Debtors and assigned to the Purchaser or any Winning Bidder until such consent is received.

32.     All three forms of Notices of Assumption and Assignment will identify the calculation of the cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Designated Executory Contract (the "**Cure Amounts**") as of such date. The Notices of Assumption and Assignment shall also contain information regarding how a non-debtor party to a Designated Executory Contract may obtain adequate assurance of future performance information from the Stalking Horse Bidder (the "**Stalking Horse Adequate Assurance Information**").  The Notice of Assumption and Assignment shall set a deadline by which the non-debtor party to a Designated Executory Contract may file an objection to the Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of such contract or lease (as applicable).  In addition, if the Debtors identify additional Contracts or Leases that might be assumed by the Debtors and assigned that are not set forth in the original Notice of Assumption and Assignment, the Debtors shall promptly send a supplemental notice (a "**Supplemental Notice of Assumption and Assignment**") to the applicable counterparties to such additional Contracts and Leases.

33.     The Debtors request that this Court set the deadline to object to any Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of any Designated Executory Contract (other than with respect to the AUA Consent Contracts) as three (3) days prior to the Auction; provided, however, that in the event that the Winning Bidder is not the Stalking Horse Bidder, the Debtors propose that any objections solely as it relates to whether such bidder can provide adequate assurance of future performance may be raised at the Sale Hearing.  To that end, the Notices of Assumption and Assignment and any Supplemental Notice

of Assumption and Assignment shall also provide that objections to any Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of any Designated Executory Contract (other than with respect to the AUA Consent Contracts) will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors subject to the Court's calendar.   As set forth above, with respect to any Affirmative AUA Consent Contracts, the Debtors may not assign such contract until the Debtors receive written consent from such Affirmative AUA Consent Contract.   Further, with respect to the Negative AUA Consent Contracts, the Debtors request that the Court set the deadline to object to the assumption and assignment of any Negative AUA Consent Contract as thirty (30) days after service of the Notice of Assumption and Assignment .

34.    The procedures and the Stalking Horse Agreement also contemplate that the Purchaser may amend the list of Designated Executory Contracts to be assumed and assigned up to the date of the Sale Hearing, or in the case of any Designated Executory Contract for which a contract party objects to an identified Cure Amount, forty-eight (48) hours after the Bankruptcy Court enters an order providing a cure amount different from the one set forth in the Notice of Assumption and Assignment or any Supplemental Notice of Assumption and Assignment. Moreover, the Stalking Horse Agreement and the Sale Order contemplate an AUA Consent Contract shall not be assumed and assigned until the Debtors have obtained such AUA Consent (including any Negative Consent).   In addition, if the Debtors fail to obtain any AUA Consent than such AUA Consent Contract shall not be assumed by the Debtors and assigned to the Purchaser or any Winning Bidder.

35.    At the Sale Hearing, the Debtors and/or the Winning Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Winning

19

Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Leases to be assumed and assigned on the Closing Date to any Winning Bidder.   For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## APPLICABLE AUTHORITY

36.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).   Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor.   See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

37.     As discussed above, the Debtors determined that the most effective way to preserve the Debtors' going concern value for the benefit of their stakeholders was through a sale of the Debtors' assets following a thorough marketing process.   The Debtors submit that a Sale of the Assets, along the timeline proposed herein, will achieve such goal.   In the absence of a sale transaction conducted in accordance with such timeline, the Debtors may face a significant deterioration in the value of the business.   As such, the Debtors submit that they have demonstrated a sound business justification for the relief requested herein.

**A.** **The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

38.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   The Debtors submit that the Bidding Procedures are appropriate to ensure that the bidding process is fair and reasonable and will yield the maximum value for their stakeholders.  Among other things, the Bidding Procedures (i) provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid, especially given the substantial pre-petition marketing described above, (ii) are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtors with the opportunity to consider all competing offers and to select the highest or otherwise best offer for the sale of substantially all of the Assets.

39.    The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.** **The Bid Protections Are Necessary to Preserve the Value of the Debtors' Estates**

40.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  Having the ability to offer the Break-Up Fee and the Expense Reimbursement to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates. Cf. ¶ 20, supra.

RLF1 12340331v.3

41.     Approval of the Break-Up Fee and the Expense Reimbursement is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

42.     The O'Brien court reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

> A.     the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> B.     whether the fee harms, rather than encourages, bidding;
>
> C.     the reasonableness of the break-up fee relative to the purchase price;
>
> D.     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
>
> E.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
>
> F.     the correlation of the fee to a maximum of value of the debtor's estate;

G.  the support of the principal secured creditors and creditors committee of the break-up fee;

H.  the benefits of the safeguards to the debtor's estate; and

I.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

43.  Here, and as is set forth in greater detail supra, the Break-Up Fee and the Expense Reimbursement are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement — a clear benefit to the Debtors' estates.  Moreover, the Stalking Horse Bidder (and the other Interested Parties that submitted a Best and Final LOI for the purchase of the Assets) would not agree to act as a stalking horse without the Break-Up Fee and the Expense Reimbursement given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Break-Up Fee and the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  Furthermore, the bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the purchase price in such agreement.  Therefore, without the benefit of the bid of the Stalking Horse Bidder (i.e., a bid providing the floor), the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

44.  "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992).  The

Debtors do not believe that the Break-Up Fee and the Expense Reimbursement will stifle bidding. To the contrary, the Debtors believe that, should an auction be held, such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662.

45.    Here, the bid of the Stalking Horse Bidder serves all three functions. First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Break-Up Fee the Expense Reimbursement. Second, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder. Third, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement, the schedules thereto, in making their bid. In sum, if the Assets are sold to a competing bidder, the Sale likely will be the result of Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

46.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id.

47.    Here, the Break-Up Fee is equal to $250,000 (or five percent (5%) of $5,000,000, which is the maximum cash portion of the Purchase Price paid by the Stalking Horse Bidder at

Closing).  When taking into account that the consideration to be paid by the Purchaser may increase significantly if the earn-outs are triggered, the Break-Up Fee and Expense Reimbursement (capped at $250,000) is consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court.  Given the size of the purchase price and the potential increase in consideration due to the earn-outs, the Debtor believes that the amounts of the Break-Up Fee and the Expense Reimbursement are appropriate.  Indeed, given that one of the competing bidders sought after multiple rounds of negotiations a breakup-fee and expense reimbursement of more than double which is provided in the Stalking Horse Agreement palpably demonstrates that the Stalking Horse Agreement is reasonable.

**C.    Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

48.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656

(Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

49.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

50.     The Debtors are running a fair and open process in chapter 11 after already having run a fair, comprehensive prepetition marketing effort.  The combined result achieves the objective of obtaining the highest or otherwise best offer and sale of their business for the benefit of the Debtors' estates.  The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

51.     For the reasons outlined above, the Debtors believe that their entry into the Stalking Horse Agreement and other ancillary documents is a sound exercise of their business judgment and supported by the facts and circumstances of this case.

52.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties

most interested in these chapter 11 cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their stakeholders and parties-in-interest.

**D.     The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

53.     Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to Section 363(b), it is only necessary to meet one of the five conditions of Section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that Section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of Section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors are prepared to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

**E.     A Winning Bidder Should be Entitled to the Protections of Section 363(m)**

54.     Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain V. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

55.     The Stalking Horse Agreement was negotiated at arm's length, with both parties represented by their own counsel. Additionally, the Debtors will adduce facts at the Sale

Hearing demonstrating that any bidder who is deemed a Winning Bidder for the Assets had negotiated at arm's length, with all parties represented by their own counsel.

56.     Accordingly, the Sale Order will include a provision that the Winning Bidder for the Assets, is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that closing of the Sale will occur promptly.

**F.     The Assumption and Assignment of Executory Contracts and Unexpired Leases**

57.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989).  The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to

control a case impartially.  See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

58.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

59.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

60.     Additionally, information will be included in the Notices of Assignment and Assumption as part of the Stalking Horse Adequate Assurance Information, including contact information on where adequate assurance information can be obtained.  Adequate assurance of future performance with respect to any Winning Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing.  Based upon the Debtors' own diligence, it can represent that upon closing, the Stalking Horse Bidder will have financial resources that are more than sufficient to perform under any Executory Contracts or Leases it seeks to have the Debtors assume and assign.  If necessary, the Debtors will adduce facts at the Sale Hearing to refute any objection, demonstrating the financial wherewithal of the Stalking Horse Bidder or any Winning Bidder, and their willingness and ability to perform under the Executory Contracts and Leases to be assumed and assigned.  The Sale Hearing therefore will provide this Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of any Winning Bidder to provide adequate assurance of future performance under the Executory Contracts and Leases that the Debtors seek to assume and assign.

61.     Accordingly, the Debtors respectfully submit that the procedures proposed herein for Executory Contracts and Leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notices of Assignment and Assumption of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

62.     Furthermore, to the extent that any defaults exist under any Executory Contract or Lease that is to be assumed and assigned in connection with the Sale of the Assets, the Winning Bidder or the Debtors (as applicable under the Winning Bidder's asset purchase agreement) will

cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Executory Contract or Lease.

63.     Accordingly, this Court therefore should have a sufficient basis to authorize the Debtors to assume and assign Executory Contracts and Leases as may be set forth in any Winning Bidder's asset purchase agreement.

**G.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

64.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."   The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.   This relief is necessary to allow the consent process to start immediately.   See supra ¶ 12.

## NOTICE

65.     The Debtors shall serve a copy of this Motion by first class mail upon:  (a) the United States Trustee for the District of Delaware; (b) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (c) counsel to the Stalking Horse Bidder; (d) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (e) each of the Debtors' landlords and any notice parties identified in the Leases, to the extent possible; (f) various federal, state, county and city tax and regulatory authorities; (g) all entities known to have expressed an interest in a transaction with respect to the Assets since April 9, 2015 or that has been identified by the Debtors or their advisors as a potential purchaser of the Assets; (h) the

31

United States Attorney General/Antitrust Division of the Department of Justice; (i) the SEC; (j) local and state environmental authorities and the federal Environmental Protection Agency; (k) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Purchased Assets; (l) all of the Debtors' creditors; and (m) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

## NO PRIOR REQUEST

66.     No prior motion for the relief requested herein has been made to this Court or any other Court.

*[Remainder of page intentionally blank]*

RLF1 12340331v.3

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and the Expense Reimbursement; (C) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (D) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate.  Additionally, the Debtors request that at the Sale Hearing, this Court enter a Sale Order, subject to the result of the Auction and to the Bidding Procedures, (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Leases; and (C) granting such other and further relief as this Court deems appropriate.

Dated: July 8, 2015
      Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Russell C. Silberglied*
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
Zachary I. Shapiro (No. 5103)
Amanda R. Steele (No. 5530)
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: silberglied@rlf.com
      merchant@rlf.com
      shapiro@rlf.com
      steele@rlf.com

Proposed Counsel for Debtors and Debtors in Possession