**THIS DISCLOSURE STATEMENT HAS <u>NOT</u> BEEN APPROVED FOR SOLICITATION PURPOSES OR OTHERWISE.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| F-Squared Investment Management, LLC, *et al.*,[1] | ) | Case No. 15-11469 (LSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE
DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**RICHARDS, LAYTON & FINGER, P.A**.
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700

*Counsel to the Debtors and Debtors in Possession*

Dated:   October 28, 2015
          Wilmington, Delaware

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788).  The Debtors' address is 945 Concord Street, Framingham, Massachusetts 01701.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. ON [●], 2015 (PREVAILING EASTERN TIME), UNLESS THE VOTING DEADLINE IS EXTENDED IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.  TO BE COUNTED, THE VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**THE DEBTORS PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT (AND THE EXHIBITS HERETO) THAT IS ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS CURRENT DOCUMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

**NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.**

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO OBJECT TO PROOFS OF CLAIM AND BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' REMAINING MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN CLASS 3 (GENERAL UNSECURED CREDITORS) SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

---

**THE CREDITORS' COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND URGES SUCH CREDITORS TO VOTE IN FAVOR OF THE PLAN.  A LETTER FROM THE CREDITORS' COMMITTEE EXPRESSING ITS SUPPORT FOR THE PLAN IS INCLUDED IN THE SOLICITATION PACKAGE.**

---

RLF1 13173029v.2

**Table of Contents**

I.      INTRODUCTION............................................................................................................. 1

      A.     Definitions and Exhibits........................................................................................ 1

             1.     Definitions .................................................................................................. 1

             2.     Exhibits ...................................................................................................... 1

      B.     Notice to Creditors ................................................................................................ 1

             1.     Purpose of Disclosure Statement ............................................................... 1

II.     OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES ...................... 2

      A.     Debtors' Prepetition Business Operations............................................................. 2

             1.     Business ...................................................................................................... 2

      B.     Debtors' Capital Structure ..................................................................................... 2

             1.     Debt Structure............................................................................................. 3

             2.     Corporate Structure.................................................................................... 3

             3.     Events Leading to the Debtors' Chapter 11 Filings................................... 4

      C.     The Chapter 11 Cases ........................................................................................... 6

             1.     Commencement of Chapter 11 Cases and the Debtors' Bankruptcy Professionals and Advisors.......................................................................... 6

             2.     Appointment of the Creditors' Committee and its Professionals............... 6

             3.     Payment of Professionals........................................................................... 6

             4.     Events During the Pendency of the Chapter 11 Cases................................ 7

III.    OVERVIEW OF THE PLAN ......................................................................................... 9

      A.     General ................................................................................................................... 9

      B.     Summary Table of Classification and Treatment of Claims and Equity Interests under the Plan ...................................................................................................... 10

      C.     Elimination of Vacant Classes ............................................................................ 13

      D.     Allocation of Distributions Between Principal and Interest................................. 13

      E.     Provisions Governing Distributions Under the Plan ........................................... 13

             1.     Initial Distribution Date ........................................................................... 13

             2.     Establishment of Disputed Claims Reserve ............................................. 13

             3.     Maintenance of Disputed Claims Reserve ............................................... 14

             4.     Federal Income Tax Treatment of Disputed Claims Reserve .................. 14

             5.     Subsequent Distributions .......................................................................... 14

             6.     Record Date for Distributions................................................................... 15

             7.     Delivery of Distributions .......................................................................... 15

             8.     Time Bar to Cash Payments by Check ...................................................... 16

             9.     Compliance with Tax Requirements.......................................................... 16

|  |  | 10. | No Payments of Fractional Dollars | 16 |
|  |  | 11. | Post-Petition Interest on Claims | 16 |
|  |  | 12. | Setoff and Recoupment | 16 |
| F. |  |  | Means for Implementation and Execution of the Plan | 16 |
|  |  | 1. | Appointment of the Liquidating Trustee and the Liquidating Trust Committee | 16 |
|  |  | 2. | Formation of the F-Squared Liquidating Trust | 17 |
|  |  | 3. | Funding of the F-Squared Liquidating Trust | 17 |
|  |  | 4. | Rights and Powers of the Liquidating Trustee | 17 |
|  |  | 5. | Fees and Expenses of the F-Squared Liquidating Trust | 18 |
|  |  | 6. | Periodic Reports Filed by the F-Squared Liquidating Trust | 18 |
|  |  | 7. | Directors/Officers/Managers and Other Authorized Persons of the Debtors | 18 |
|  |  | 8. | Liquidation, Dissolution, and Termination of the Debtors | 18 |
|  |  | 9. | Operations of the Debtors Between the Confirmation Date and the Effective Date | 18 |
|  |  | 10. | Establishment of the Administrative Bar Date | 18 |
|  |  | 11. | Term of Injunctions or Stays | 19 |
|  |  | 12. | Cancellation of Equity Interests | 19 |
|  |  | 13. | Dissolution of the Creditors' Committee | 19 |
| G. |  |  | Procedures for Resolving and Treating Disputed Claims | 19 |
|  |  | 1. | No Distribution Pending Allowance | 19 |
|  |  | 2. | Resolution of Disputed Claims | 19 |
|  |  | 3. | Estimation of Claims | 19 |
|  |  | 4. | Disallowance of Claims | 20 |
|  |  | 5. | Adjustment to Claims Without Objection | 20 |
|  |  | 6. | Amendments to Claims or Interests | 20 |
| H. |  |  | Treatment of Executory Contracts and Unexpired Leases | 20 |
|  |  | 1. | Rejection of Executory Contracts and Unexpired Leases | 20 |
|  |  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 21 |
|  |  | 3. | Insurance Policies | 21 |
| I. |  |  | Conditions Precedent to Effective Date of the Plan | 21 |
|  |  | 1. | Conditions Precedent to the Effective Date | 21 |
| J. |  |  | Establishing the Effective Date | 21 |
| K. |  |  | Release, Injunction, and Related Provisions | 21 |
|  |  | 1. | Compromise and Settlement | 21 |
|  |  | 2. | Releases by the Debtors | 22 |
|  |  | 3. | Exculpation | 22 |
|  |  | 4. | Injunction | 22 |

|        | 5. | Releases of Liens | 23 |
|        | 6. | Substantive Consolidation | 23 |
|        | 7. | Preservation of Rights of Action | 24 |
| IV. | ALTERNATIVES TO THE PLAN | | 25 |
|     | A. | Liquidation Under Chapter 7 of the Bankruptcy Code | 25 |
|     | B. | Alternative Chapter 11 Plan | 25 |
| V. | FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | 25 |
| VI. | SOLICITATION AND VOTING PROCEDURES | | 26 |
|     | A. | Distribution of the Solicitation Materials | 26 |
|     | B. | Voting Instructions and General Tabulation Procedures | 26 |
|        | 1. | Voting Record Dates | 26 |
|        | 2. | Voting Deadline | 27 |
| VII. | CONFIRMATION PROCEDURES | | 27 |
|     | A. | Confirmation Hearing | 27 |
|     | B. | Statutory Requirements for Confirmation of the Plan | 27 |
|        | 1. | Best Interests of Creditors Test | 28 |
|        | 2. | Feasibility | 28 |
|        | 3. | Acceptance by Impaired Classes | 29 |
|        | 4. | Confirmation Without Acceptance by All Impaired Classes | 29 |
|        | 5. | No Unfair Discrimination | 29 |
|        | 6. | Fair and Equitable Test | 29 |
| VIII. | CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING | | 30 |
|     | A. | Risk Factors that May Affect the Debtors' Ability to Consummate the Plan | 30 |
|        | 1. | Failure to Satisfy Vote Requirement | 30 |
|        | 2. | Debtors May Not Be Able to Secure Confirmation of the Plan | 30 |
|        | 3. | Nonconsensual Confirmation | 31 |
|        | 4. | The Level of Administrative Claims and Priority Tax Claims Could Make the Plan Lack Feasibility | 31 |
|        | 5. | Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests | 31 |
|        | 6. | Risk of Non-Occurrence of the Effective Date | 31 |
|     | B. | Risk Factors that may Affect Distributions under the Plan | 31 |
|        | 1. | Debtors May Object to the Amount or Classification of a Claim | 32 |
|        | 2. | Earn-Out Payments | 32 |
|        | 3. | Potential Priority Claims of Former Employees | 32 |
|        | 4. | Newfound Research LLC's and Compass Capital Management (US), LLC's Proofs of Claim | 32 |
|        | 5. | The Virtus Litigation | 33 |

|   |   | 6. | Uncertain Obligations owed to Howard Present | 33 |
|   |   | 7. | Other Substantial Disputed or Unliquidated Claims | 34 |
|   |   | 8. | Potential Recoveries from D&O Carriers | 34 |
|   |   | 9. | Potential Tax Refund | 34 |
|   |   | 10. | Other Litigation Claims | 34 |
|   |   | 11. | Employee Loans | 34 |
|   | C. | | Disclosure Statement Disclaimer | 34 |
|   |   | 1. | Information Contained Herein is for Soliciting Votes | 34 |
|   |   | 2. | No Legal or Tax Advice is Provided to You by this Disclosure Statement | 35 |
|   |   | 3. | No Admissions Made | 35 |
|   |   | 4. | Failure to Identify Claims, Litigation Claims or Projected Objections | 35 |
|   |   | 5. | No Waiver of Right to Object or Right to Recover Transfers and Assets | 35 |
|   |   | 6. | Information was Provided by the Debtors and was Relied upon by the Debtors' Advisors | 35 |
|   |   | 7. | Potential Exists for Inaccuracies, and the Debtors have no Duty to Update | 35 |
| IX. | | | CONCLUSION | 35 |

## I.    INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of F-Squared Investment Management, LLC (the "**Parent**") and its subsidiaries (each a "**Debtor**" and, collectively, the "**Debtors**") in the above-captioned chapter 11 cases, pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").   This Disclosure Statement is filed in connection with the Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), dated October 28, 2015 (the "**Plan**"), a copy of which is attached to this Disclosure Statement as **Exhibit A**.

### A.    Definitions and Exhibits

#### 1.    Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

#### 2.    Exhibits

All exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

### B.    Notice to Creditors

#### 1.    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists holders of Claims entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [●], 2015 (the "**Disclosure Statement Order**"), the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information" as that term is used in Section 1125(a)(1) of the Bankruptcy Code.   The Bankruptcy Court, however, has not passed on the merits of the Plan.   Creditors should carefully read the Disclosure Statement, in its entirety, before voting on the Plan.

**IT IS THE OPINION OF THE DEBTORS AND THE CREDITORS' COMMITTEE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS.   THEREFORE, THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT CREDITORS VOTE TO APPROVE THE PLAN.**

PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.   A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A**.   THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES.   ACCORDINGLY, IF ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT EXISTS, THE TERMS OF THE PLAN SHALL CONTROL.

II.    **OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES**

    A.    **Debtors' Prepetition Business Operations**

        1.    **Business**

Founded in May 2006, and prior to ceasing operations (except as provided herein) on the Sale Closing Date, the Debtors consisted of SEC registered investment management firms with corporate headquarters in Wellesley, Massachusetts and a New Jersey based team of scientists, mathematicians, and programmers that conducted research and development. The Debtors' clients were generally investment advisors who sold the Debtors' model services to their own clients. The Debtors served clients in the advisor, institutional, retail, and retirement markets and sought to provide them with an investment approach that protected them in down markets and facilitated participation in up markets. As of March 31, 2015, the Debtors had over $16 billion in assets under advisement (*i.e.*, the market value of assets that an investment company manages on behalf of investors) ("**AUA**"). As is discussed in greater detail below, the AUA declined significantly by the Filing Date and declined even more by the Sale Closing Date.

Specifically, the Debtors provided various index products on a non-discretionary basis to unaffiliated third parties and separately provided discretionary investment advisory services based on those index products to various separately managed client accounts. A summary of the role that each Debtor played in the Debtors' business is as follows:

- Debtor F-Squared Investment Management, LLC created and licensed a series of specialty indexes covering a range of asset classes. Such indexes were based on sector rotation strategies that employed quantitative models programmed to measure the volatility and price of movements of exchange-traded funds.

- Debtor F-Squared Capital, LLC provided investment advisory services related to various index products on a discretionary basis for separately managed client accounts.

- Debtors F-Squared Investments, Inc., F-Squared Institutional Advisors, LLC, and F-Squared Retirement Solutions, LLC provided various index products on a non-discretionary basis to unaffiliated third parties and separately provided discretionary investment advisory services based on those index products to various separately managed client accounts.

- Debtor F-Squared Solutions, LLC provided investment advisory services to institutional unaffiliated third parties. However, on the Filing Date, Debtor F-Squared Solutions, LLC had no funded clients.

- Debtor Active Index Solutions, LLC created the indexes used by many of the other Debtors and licensed such indexes to the Debtors for their investment advisory services.

- Debtor AlphaSector LLS GP1, LLC ("**AlphaSector**") is one of many limited partners in non-Debtor entity F-Squared U.S. Sector Opportunities Fund, LP (the "**Hedge Fund**") and also serves as the sole general partner of the Hedge Fund. Debtor F-Squared Alternative Investments, LLC ("**Alternative Investments**") served as the investment manager of the Hedge Fund. Prior to the Sale Closing Date, the Hedge Fund, which invested its funds based on the Debtors' investment strategies, allowed the Debtors to showcase the success of such strategies based on the actual track record of the Hedge Fund.

    B.    **Debtors' Capital Structure**

As reflected in the Schedules, as of the Filing Date, the Debtors had total liabilities and other obligations of approximately $[23.2] million (excluding Intercompany Claims) and approximately 28.9 million units

of outstanding common and preferred LLC units.  A discussion of the Debtors' capital structure, including their various debt obligations, is set forth below.

### 1.    Debt Structure

The Debtors have no funded secured debt.[2]  Nearly all of the Debtors' liabilities are unsecured. The largest categories consist of: (a) contract and lease rejection damages claims, (b) potential indemnification claims asserted by Howard B. Present, Virtus Investment Partners, Inc. ("**Virtus**") and others, (c) disputed litigation claims including those filed by Youngers, Celico and others; (d) severance obligations and (e) other specific claims that are more particularly described in Article VIII.B. hereof (Risk Factors) or are otherwise disputed.

### 2.    Corporate Structure

#### a.    The Parent

The Parent is a holding company that is owned by a number of individuals and corporate entities. Specifically, prior to the Filing Date, the Parent issued both common LLC units (totaling 20,656,824 in the aggregate) and preferred LLC units (totaling 8,218,842 in the aggregate) to such individuals and corporate entities. No controlling or majority unitholder exists.  Approximately thirty-two of the Debtors' former employees collectively hold about forty-six percent (46%) of the total outstanding units.  Board members of the Parent and employees as of the Filing Date own approximately thirty-one percent (31%) of the total outstanding units. Individual investors hold the remaining twenty-three percent (23%) of the total outstanding units.  The preferred LLC units have a liquidation preference in the amount of $4.5 million.

#### b.    The Subsidiary Debtors

The Parent indirectly owns and controls each of the Debtors.  A detailed organization chart of the Debtors is below.[3]

---

[2] One of the Debtors' former landlords has an irrevocable letter of credit in its favor and one of the Debtors' former law firms holds a $100,000 retainer that is alleged to be less than the amount that the Debtors owe the law firm on account of services rendered.

[3] As indicated above, the grey-shaded entity, which is the Hedge Fund, is a non-Debtor in the Chapter 11 Cases.

3



### 3.    Events Leading to the Debtors' Chapter 11 Filings

a.    The Settlement with the U.S. Securities and Exchange Commission

On December 22, 2014, the Debtors agreed to a settlement (the "**SEC Settlement**") of an administrative cease-and-desist proceeding (the "**SEC Proceeding**") with the SEC related to the advertising of the Debtors' performance track record for the period between April 2001 and September 2008. Pursuant to the SEC Settlement, the Debtors acknowledged that their conduct violated federal securities laws, consented to strict compliance review, and paid a $5 million penalty and $30 million in disgorged profits. As a result of the SEC Settlement, the Debtors are no longer the subject of any enforcement action by the SEC.

The Debtors' former chief executive officer, Howard B. Present, remains the subject of a related SEC proceeding. Mr. Present resigned as the Debtors' CEO in November of 2014, a month before the SEC Settlement. Mr. Present has not reached a settlement with the SEC and has elected to proceed to trial. Pursuant to indemnification provisions contained in the Debtors' corporate documents, the Debtors are required to indemnify Mr. Present for his reasonable legal costs in connection with his SEC proceeding, subject to certain limitations also set forth in the Debtors' corporate documents and subject to federal bankruptcy law. Upon information and belief, Mr. Present's SEC proceeding is expected to reach the trial phase in early 2017.

The weight of the SEC Settlement and related expenses caused significant financial hardship for the Debtors. In addition to the payment of a $5 million fine and $30 million in disgorged profits pursuant to the

SEC Settlement, in 2014 alone, the Debtors accumulated more than $17.2 million in legal costs.[4]  Furthermore, the Debtors paid substantial sums to indemnify Mr. Present pursuant to their corporate documents.  Perhaps more importantly, many of the Debtors' customers terminated their relationship with the Debtors in an effort to avoid any "taint" given the SEC Settlement.

> b.    Other Contributing Events and Reduction in Workforce

Prior to the SEC Proceeding, the Debtors generated billions of dollars of AUA.  As a result of the SEC Proceeding, a number of the Debtors' distribution customers removed certain of the Debtors' products from their platforms or ceased any relationship with the Debtors at all.  In early 2015, four of the Debtors' distribution customers representing $4.3 billion of AUA notified the Debtors that, as of March 31, 2015, they would remove their assets from the Debtors' management services.  Then, in May 11, 2015, Virtus terminated its relationship with the Debtors.  The Debtors had served as a sub-advisor on several popular mutual funds from Virtus and certain affiliates of Virtus, making Virtus the Debtors' single biggest customer.  The resulting loss of $5.7 billion of AUA was a substantial hit to the Debtors' business.

Due to the mounting legal expenses and loss of customers described above, the Debtors began taking steps to minimize their expenses.  In March of 2015, the Debtors reduced their workforce from 162 employees to 117 employees, resulting in an approximately $4.7 million reduction in run-rate expenses.  As a result of this reduction in the Debtors' workforce, the Debtors incurred approximately $1.3 million in severance obligations, a portion of which may be entitled to priority treatment under the Bankruptcy Code.

> c.    Prepetition Marketing Efforts of the Debtors' Assets

Given the economic effects of the SEC Settlement and resulting loss of customers, the Debtors retained Grail Advisory Partners LLC d/b/a/ PL Advisors ("**PL Advisors**") as its investment banker and financial advisor in March of 2015.  PL Advisors' initial charge focused on raising capital, but allowed for possible alternative transactions.  PL Advisors identified financial and strategic investors (collectively, the "**Interested Parties**") to garner interest in pursuing a recapitalization of the Debtors.

Commencing on April 9, 2015, PL Advisors contacted and/or sent teasers to fifty-one (51) Interested Parties.  The initial concept was for a capital raise given the $35 million payment in the SEC Settlement, but the Debtors informed interested parties that they were open to any form of transaction.  Twenty-six (26) Interested Parties executed non-disclosure agreements by May 1, 2015.  On or around May 1, 2015, PL Advisors sent a letter to all Interested Parties, excluding those Interested Parties that had indicated they would not submit a bid, requesting all non-binding letters of intent by May 18, 2015 at 12:00 p.m. (prevailing Eastern Time).

As set forth above, on May 11, 2015, Virtus terminated its relationship with the Debtors.  Coupled with the loss of the four (4) large customers in Q1 2015, the loss of the Virtus business had significant impact.  Thus, the Debtors' board of directors determined that a sale of the Debtors' assets rather than a recapitalization was more likely to maximize value.  Due to further marketing efforts, five (5) additional parties executed non-disclosure agreements after the Virtus termination, resulting in a total of thirty-one (31) non-disclosure agreements executed by Interested Parties.  On May 15, 2015, PL Advisors updated the confidential information memorandum to account for the Virtus termination and distributed the memorandum to the thirteen (13) Interested Parties that remained interested in a transaction with the Debtors.

PL Advisors received the first letter of intent ("**LOI**") on May 18, 2015.  In all, PL Advisors received four (4) LOIs.  Each Interested Party that submitted a LOI received access to the electronic data room.

Based on feedback received from certain bidders and an analysis of the evolving landscape, on or about June 1, 2015, the Debtors' board of directors made the decision to pursue a sale process pursuant to Bankruptcy Code Section 363 to maximize value.  PL Advisors informed all Interested Parties still engaged in a

---

[4] The Debtors recovered approximately $10 million of those legal costs from their directors' and officers' insurance policy (the "**D&O Policy**").  As is discussed in greater depth below, the Debtors believe that they may be able to recover additional amounts under the D&O Policy but the amounts, if any, that the Debtors may ultimately be able to recover is highly speculative and contested by the insurance companies.

potential transaction to revise their bids accordingly.  Four (4) Interested Parties submitted LOIs incorporating a Section 363 sale process.  On June 12, 2015, after reviewing and carefully considering the revised LOIs, the Debtors, in consultation with their advisors, determined that PL Advisors should request that each bidder submit a best and final letter of intent ("**Best and Final LOI**").  After reviewing and carefully considering the Best and Final LOIs received, the Debtors determined, in consultation with their advisors, that the Best and Final LOI submitted by Cedar Capital, LLC ("**Cedar Capital**") was the highest or otherwise best offer for the Debtors' assets.  The other three bidders were informed that their Best and Final LOIs were not chosen as the highest or otherwise best offer and that the Debtors had not entered into an exclusivity arrangement with Cedar Capital.  In fact, during the process of negotiating with Cedar Capital, the Debtors returned to a previous bidder to see if the bidder remained interested in purchasing the assets.  The other bidder informed the Debtors that it would not purchase the assets unless the Debtors agreed to certain conditions that the Debtors' management found inappropriate.

On July 3, 2015, the Debtors and Broadmeadow Capital, LLC, a wholly owned subsidiary of Cedar Capital ("**Broadmeadow**" or the "**Purchaser**"), entered into a stalking horse asset purchase agreement (the "**Asset Purchase Agreement**") pursuant to which the Debtors would sell substantially all of their operating assets to Broadmeadow in exchange for up to $5 million cash at closing plus contingent Earn-Out Payments.  The $5 million purchase price remained subject to reduction if AUA transferable pursuant to the Asset Purchase Agreement fell below $2 billion.  In addition, pursuant to the Asset Purchase Agreement, Broadmeadow was not required to close the Sale if AUA fell below $1 billion on the Sale Closing Date.

Under the Asset Purchase Agreement, Broadmeadow agreed to act as the stalking horse bidder and to make the Asset Purchase Agreement subject to higher and better offers in exchange for certain bid protections, including a break-up fee and expense reimbursement (the "**Break-Up Fee**").

## C.    The Chapter 11 Cases

### 1.    Commencement of Chapter 11 Cases and the Debtors' Bankruptcy Professionals and Advisors

On July 8, 2015 (the "**Filing Date**"), each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code.

The Debtors retained, *nunc pro tunc* to the Filing Date, Richards, Layton & Finger, P.A. as their bankruptcy counsel [Docket No. 128], PL Advisors as their investment banker [Docket No. 124], BMC Group, Inc. as their claims and noticing agent and administrative advisor and voting agent [Docket Nos. 23 & 130], and Stillwater Advisory Group LLC (the "**Stillwater**") to provide the Debtors with a chief restructuring officer, David N. Phelps [Docket No. 129].[5]

### 2.    Appointment of the Creditors' Committee and its Professionals

On July 15, 2015, the U.S. Trustee, pursuant to Section 1102 of the Bankruptcy Code, appointed the Creditors' Committee to represent the interests of general unsecured creditors in the Chapter 11 Cases.  The Creditors' Committee is comprised of Nathan Eigerman, Cantella & Co., and Grove Street Advisors.  The Creditors' Committee is represented by the law firms of Brown Rudnick LLP and The Rosner Law Group LLC.

### 3.    Payment of Professionals

The Debtors' Professionals (other than Stillwater which is being paid pursuant to the terms of Stillwater's retention order) and the Creditors' Committee's Professionals have been paid interim amounts on account of services rendered and expenses incurred pursuant to the terms of the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 127].

---

[5] Between May 19, 2015 and the Filing Date, Mr. Phelps served as an advisor  to (and not an officer of) the Debtors and assisted the Debtors with, among other things, the Sale.  Once the Chapter 11 Cases were commenced, Mr. Phelps was appointed as an officer (*i.e.*, the Chief Restructuring Officer) of the Debtors and has served in that capacity since that date.

### 4.    Events During the Pendency of the Chapter 11 Cases

#### a.    First Day Motions

On the Filing Date, the Debtors filed a number of motions and other pleadings (the "**First Day Motions**") to ensure an orderly transition into chapter 11, including the following:

- a motion for the joint administration of the Chapter 11 Cases for procedural purposes [Docket No. 2];

- an application to retain BMC Group, Inc. as the Debtors' claims and noticing agent [Docket No. 4];

- a motion for authority to pay certain prepetition employee-related obligations and certain related relief [Docket No. 8];

- a motion to honor certain prepetition and post-petition obligations pursuant to customer programs [Docket No. 7];

- a motion to establish procedures for determining adequate assurance for the provision of utility services and to prohibit utility service providers from altering, refusing, or discontinuing service [Docket No. 6]; and

- a motion relating to the continued use of the Debtors' existing cash management system [Docket No. 5].

The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court and/or the U.S. Trustee [Docket Nos. 21, 22, 23, 24, 25, 26, 123, 131, & 132].

#### b.    The Debtors' Other Professionals

In addition to the Professionals that they retained *nunc pro tunc* to the Filing Date, the Debtors retained Katz, Nannis + Solomon, P.C. as their outside accountants *nunc pro tunc* to August 5, 2015 [Docket No. 251] to assist with certain tax and auditing services required by federal law. Also, the Debtors have retained several ordinary course professionals ("**Ordinary Course Professionals**") pursuant to the procedures set forth in the *Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business, Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 125].

#### c.    The Sale of Substantially all of the Debtors' Operating Assets

As set forth above, on July 3, 2015, the Debtors and Broadmeadow entered into the Asset Purchase Agreement. On the Filing Date, the Debtors filed a motion [Docket No. 9] (the "**Sale Motion**") seeking entry of two orders related to the Sale. The first, the bidding procedures order (the "**Bid Procedures Order**"), sought approval of bidding procedures relating to the Sale including, among other things, designating Broadmeadow as the stalking horse purchaser, approval of the Break-Up Fee, approval of auction procedures, and scheduling the hearing to approve the Sale (the "**Sale Hearing**"). The Second, the Sale Order, sought approval of the Sale to Broadmeadow or the highest or otherwise best bidder (as determined at an auction, if applicable).

On July 28, 2015, the Bankruptcy Court held a hearing to consider entry of the Bid Procedures Order (the "**Bid Procedures Hearing**"). At the Bid Procedures Hearing, counsel to the Debtors informed the Bankruptcy Court of the Debtors' concern that AUA transferred pursuant to the Asset Purchase Agreement would be less than $1 billion on the Sale Closing Date and, as a result, there was a risk that the Sale to Broadmeadow would not close absent a modification to that closing condition. After arm's-length negotiations between the Debtors, the Creditors' Committee, and Broadmeadow, Broadmeadow agreed to modify that closing condition to reduce the minimum AUA threshold from $1 billion to $250 million in exchange for the Creditors' Committee

RLF1 13173029v.2

agreeing not to object to the Break-Up Fee.  Such modification was memorialized in Amendment No. 1 to the Asset Purchase Agreement.  After the conclusion of the Bid Procedures Hearing, the Bankruptcy Court entered the Bid Procedures Order [Docket No. 75].

Thereafter, with the goal of garnering interest in the Sale, PL Advisors sent the Bid Procedures Order and the Sale Motion to all potentially interested parties whom PL Advisors previously contacted. Additionally, PL Advisors and the Debtors received numerous calls regarding the Sale that resulted in additional parties signing nondisclosure agreements and accessing the data room.  Further, PL Advisors and the Debtors' management team conducted numerous due diligence calls with certain parties (other than Broadmeadow) that remained active in the data room.

The Creditors' Committee also provided PL Advisors with three additional parties who they believed could have an interest in pursuing the Sale.  One of the parties had already spoken with PL Advisors, and the other two parties declined to submit a bid.  By mid-August of 2015, the last two remaining interested parties informed PL Advisors that they would not submit bids.  As a result, pursuant to the Bid Procedures Order, the Debtors cancelled the auction for the Debtors' assets and designated Broadmeadow as the winning bidder.

On August 25, 2015, the Bankruptcy Court conducted the Sale Hearing and approved the Sale to Broadmeadow.  The Sale to Broadmeadow closed on September 8, 2015 (the "**Sale Closing Date**").  The cash portion of the Sale purchase price paid to the Debtors on the Sale Closing Date was $1 million (less certain expenses and deductions).

d.    Wind-down

Due to the closing of the Sale, the Debtors ceased all operations (other than providing certain limited transition services to Broadmeadow for a limited time period that has since expired]) and, consequently, only maintained a limited number of employees.  Since the Sale Closing Date, the Debtors, with the assistance of their advisors and in consultation with the Creditors' Committee, have focused their efforts on accomplishing the orderly wind-down of the Estates, including proposing and implementing the Plan.

To that end, in anticipation of and following the closing of the Sale, the Debtors obtained the authority to (i) dissolve the Hedge Fund,[6] (ii) sell certain office furniture, (iii) reject their non-residential real property leases, including the lease of two of their former corporate headquarters, a sublease, several office furniture and office equipment leases,  and (iv) reject certain other executory contracts that are no longer of any value to the Debtors given the cessation of their business, including contracts with customers that did not consent to assignment to Broadmeadow.  [Docket Nos. 188, 221, 256, 276, 284, 296, & 304].

e.    Schedules and Statements and Bar Dates

On August 12 and 13, 2015, the Debtors filed their Schedules and statements of financial affairs.

On July 22, 2015, the Debtors filed a motion [Docket No. 60] (the "**Bar Date Motion**") to establish certain bar dates for filing proofs of Claim against the Debtors' Estates.  On August 10, 2015, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion [Docket No. 126] (the "**Bar Date Order**"), and established September 14, 2015 at 5:00 p.m. (prevailing Eastern Time) as the General Bar Date and January 4, 2016 at 5:00 p.m. (prevailing Eastern Time) as the Governmental Unit Bar Date.

As of the General Bar Date, the Debtors received or scheduled the following Claims:

---

[6] When the Asset Purchase Agreement was originally executed, it was uncertain whether the Hedge Fund would be a "purchased asset" or an "excluded asset" under the agreement.  Prior to the Sale Closing Date, Broadmeadow determined that it did not desire to acquire the Hedge Fund and, therefore, designated the Hedge Fund as an "excluded asset" pursuant to Amendment No. 2 to the Asset Purchase Agreement. See Docket No.  223.  Because the Hedge Fund is an "excluded asset," the Debtors were obligated under the terms of the Asset Purchase Agreement to wind down and dissolve the Hedge Fund and obtain the Bankruptcy Court's authority to do so.  The Bankruptcy Court entered an order authorizing the general partner to proceed with such dissolution on October 13, 2015.  See Docket No. 304.

| Claim Priority | Total Number of Claims Filed/Scheduled | Total Face Amount of Claims Filed/Scheduled[7] |
|---|---|---|
| Secured Claims | [3] | [$101,564.00] |
| Administrative Claims | [0] | [$0.00] |
| Priority Non-Tax Claims | [39] | [$679,302.95] |
| Priority Tax Claims | [6] | [$3,229.53] |
| General Unsecured Claims | [266] | [$2,113,768,063.71] |

The Debtors and Creditors' Committee are in the process of reviewing proofs of Claim and expect to file several claims objections over the coming months. Consequently, the Debtors anticipate that the figures set forth above, which reflect the face amount of Claims Filed or scheduled, will be reduced significantly following the claims reconciliation process.

## III.   OVERVIEW OF THE PLAN

### A.   General

This section of the Disclosure Statement summarizes certain sections of the Plan, which is set forth in its entirety as **Exhibit A** hereto. This summary is qualified in its entirety by reference to the Plan. YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or equity interests are "Impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim or equity interest in such class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims or equity interests in such class.

In addition, pursuant to section 1126 of the Bankruptcy Code, holders of Impaired claims and equity interests are only required to vote on a plan if such holders are receiving or retaining property under the plan. Claims in Class 3 (General Unsecured Claims) are Impaired and the holders of such Claims are receiving or retaining property under the Plan and, therefore, may vote on the Plan. Equity Interests in Class 4 (Equity Interests in the Parent) are also Impaired. However, such holders are not receiving or retaining any property under the Plan and, therefore, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "Unimpaired," and because of the favorable treatment accorded to such classes, they are conclusively deemed to have accepted the plan and therefore need not be solicited to vote to accept or reject the plan. The holders of Claims in Class 1 (Secured Claims) and Class 2 (Priority Non-Tax Claims) are Unimpaired and, therefore, are deemed to accept the Plan and are not being solicited in connection with the Plan pursuant to section 1126(f) of the Bankruptcy Code.

---

[7] The figures reflected herein reflect the amounts asserted in proofs of Claim or as scheduled by the Debtors. There are Claims asserted against, or scheduled by, the Debtors that are unliquidated for which no monetary value has been assigned herein.

Finally, certain classes of Claims and Equity Interests are not classified under the Plan and thus are not entitled to vote on the Plan.  Such classes include Administrative Claims, Priority Tax Claims, Intercompany Claims and Intercompany Interests.

Therefore, based on the foregoing, only the holders of Claims in Class 3 (General Unsecured Claims) are receiving a ballot to submit their votes on the Plan and all other holders of Claims and Equity Interests are not entitled to vote on the Plan.

**B.**      **Summary Table of Classification and Treatment of Claims and Equity Interests under the Plan**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Compensation Claims and Priority Tax Claims.  In addition, Intercompany Claims and Intercompany Interests are deemed to be satisfied and resolved by the substantive consolidation provided for in the Plan.  Accordingly, except for Administrative Claims, Priority Tax Claims, Intercompany Claims and Intercompany Interests, all Claims against and Equity Interests in a particular Debtor are divided into four (4) Classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth below.  Such classification takes into account the different nature and priority of the Claims and Equity Interests.  The Plan contains one Class each for Secured Claims (Class 1), Non-Tax Priority Claims (Class 2), General Unsecured Claims (Class 3), and Equity Interests in the Parent (Class 4).  Classes 1 and 2 are Unimpaired and Classes 3 and 4 are Impaired under the Plan.

The estimated percentage recovery to holders of Allowed General Unsecured Claims is dependent on, among other things, the amount remaining after the reconciliation and payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, the Liquidating Trust Expenses, the net recoveries of the Estates on account of the Retained Causes of Action, the total amount of General Unsecured Claims that become Allowed Claims, and whether any Earn-Out Payments are received.  There can be no assurance that the estimated amount of Allowed Claims in each Class are correct, and actual Allowed amounts may be significantly different from the estimates.  The following table is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as **Exhibit A**.  In no case will any creditor receive more than one-hundred percent (100%) of its Allowed Claim.

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Estimated Recovery Under Plan, Voting Status, Treatment Under the Plan |
|---|---|---|---|
| N/A | Administrative Claims and Professional Compensation Claims | [$_____] | Recovery:  100%<br><br>Voting Status: Not applicable.<br><br>Treatment: Each holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court. Subject to the provisions of Sections 328, 330(a), and 331 of the Bankruptcy Code, the Liquidating Trust shall pay each holder of an Allowed Professional Compensation Claim the full unpaid amount of such Allowed Professional Compensation Claim in Cash no later than five (5) Business Days after the date that such Claim is Allowed by order entered by the Bankruptcy Court. |
| N/A | Priority Tax Claims | [$_____] | Recovery:  100%<br><br>Voting Status: Not applicable.<br><br>Treatment: Except to the extent that a holder of an Allowed Priority Tax Claim against a Debtor agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. |

RLF1 13173029v.2

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Estimated Recovery Under Plan, Voting Status, Treatment Under the Plan |
|---|---|---|---|
| Class 1 | Secured Claims | [$_____] | Recovery: 100% <br><br> Voting Status: Unimpaired / Deemed to Accept <br><br> Treatment: Unless otherwise mutually agreed upon by the holder of an Allowed Secured Claim and the Debtors or Liquidating Trustee, as applicable, on the later of the Effective Date and the date such Allowed Secured Claim becomes Allowed or as soon thereafter as is practicable, the F-Squared Liquidating Trust shall pay each holder of an Allowed Secured Claim, at the Liquidating Trustee's sole and exclusive election, in full and final satisfaction of such Allowed Secured Claim, one of the following:  (i) the collateral securing such Allowed Secured Claim,  (ii) Cash in an amount equal to the value of such collateral, or (iii) such other treatment that renders such Allowed Secured Claim Unimpaired. |
| Class 2 | Priority Non-Tax Claims | [$_____] | Recovery:  100% <br><br> Voting Status: Unimpaired / Deemed to Accept <br><br> Treatment: Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors or Liquidating Trustee, as applicable, on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes Allowed, or as soon thereafter as is practicable, the F-Squared Liquidating Trust shall pay to each holder of an Allowed Priority Non-Tax Claim the full amount of such Allowed Priority Non-Tax Claim in Cash in full and final satisfaction of such Allowed Priority Non-Tax Claim. |
| Class 3 | General Unsecured Claims | [$_____] | Recovery:  Estimated to be [_.0 - _.0]% <br><br> Voting Status: Impaired / Entitled to Vote <br><br> Treatment: On or as soon as practicable after the Initial Distribution Date and/or any Subsequent Distribution Date, the F-Squared Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund. |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Estimated Recovery Under Plan, Voting Status, Treatment Under the Plan |
|---|---|---|---|
| Class 4 | Equity Interests in the Parent | 0% | Recovery:  None<br><br>Voting Status: Impaired / Deemed to Reject<br><br>Treatment: On the Effective Date, all Equity Interests issued by the Parent shall be cancelled. Each holder of an Equity Interest in the Parent shall neither receive nor retain any property or interest in property on account of such Equity Interests; provided, however, that in the event, and only in the event, that all Allowed Claims have been satisfied in accordance with the Bankruptcy Code and the Plan, holders of Equity Interests in the Parent may receive their Pro Rata share of the Liquidating Trust Fund. It is not expected that any Distributions will be made to holders of Equity Interests in the Parent.  The rights of holders in Class 4 shall be nontransferable. |

C.    **Elimination of Vacant Classes**

Any Class of Claims or Equity Interests that does not contain, as of the Confirmation Date, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

D.    **Allocation of Distributions Between Principal and Interest**

For Distributions in respect of Allowed General Unsecured Claims, to the extent that any such Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

E.    **Provisions Governing Distributions Under the Plan**

1.    **Initial Distribution Date**

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the F-Squared Liquidating Trust shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

2.    **Establishment of Disputed Claims Reserve**

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the F-Squared Liquidating Trust shall establish a separate Disputed Claims Reserve for Disputed Claims, which Disputed Claims Reserve shall be administered by the F-Squared Liquidating Trust.  The F-Squared Liquidating Trust shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the Pro Rata amount that such Disputed Claim would be entitled to receive under the Plan if it were to become an Allowed Claim in its respective Class (or such lesser amount as may be determined by the Liquidating Trustee and the holder of such Disputed Claim or by the Bankruptcy Court in accordance with Article VI.C hereof).

3.        **Maintenance of Disputed Claims Reserve**

a.        The F-Squared Liquidating Trust shall hold property in the Disputed Claims Reserve in trust for the benefit of the holders of Disputed Claims ultimately determined to be Allowed. The Disputed Claims Reserve shall be closed and extinguished by the F-Squared Liquidating Trust when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan.  Upon closure of the Disputed Claims Reserve, all Cash or other property held in that Disputed Claims Reserve shall revest in and become the property of the F-Squared Liquidating Trust.  All funds or other property that vest or revest in the F-Squared Liquidating Trust pursuant to Article V of the Plan shall be (a) used to pay the fees and expenses of the F-Squared Liquidating Trust as and to the extent set forth in the Liquidating Trust Agreement, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

b.        Except as expressly set forth in the Plan, neither the Debtors nor the Liquidating Trustee shall have any duty to fund the Disputed Claims Reserve.

4.        **Federal Income Tax Treatment of Disputed Claims Reserve**

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Liquidating Trustee shall either (1) timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by United States Treasury Regulation Section 1.468B-9 or (2) treat such Liquidating Trust Assets as a "complex trust," in either case with the consent of the Liquidating Trust Committee.  All parties (including, without limitation, the Liquidating Trustee and the Beneficiaries) shall report consistently with the foregoing for federal, state, and local income tax purposes.

5.        **Subsequent Distributions**

a.        Any Distribution that is not made on the Initial Distribution Date or on any Subsequent Distribution Date because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the F-Squared Liquidating Trust in the Disputed Claims Reserve pursuant to Article V.B of the Plan and Distributed (in full in the case of Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims; and up to its Ratable Proportion with respect to the Claims in Class 3) on the next Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Subsequent Distribution Date in accordance with Article V.C of the Plan.

b.        To the extent any holder of an Allowed General Unsecured Claim that received a Distribution on account of such Claim on the Initial Distribution Date or any Subsequent Distribution Date is entitled to receive an additional Distribution on account of such Claim for any reason, including due to an increase in the Ratable Proportion of such Claim or additional assets becoming part of the Liquidating Trust Fund, the Liquidating Trustee shall, in its discretion, make such additional Distribution to such holder on any Subsequent Distribution Date.

14

6.        **Record Date for Distributions**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The F-Squared Liquidating Trust shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the F-Squared Liquidating Trust shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that is actually known to the F-Squared Liquidating Trust as of the Record Date.

7.        **Delivery of Distributions**

a.        General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the F-Squared Liquidating Trust or its designee, assuming the availability of funds and the economic feasibility of such Distributions, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Debtors have been notified in writing of a change of address.  If any Distribution is returned as undeliverable, the F-Squared Liquidating Trust may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the F-Squared Liquidating Trust deems appropriate, but no Distribution to any such holder shall be made unless and until the F-Squared Liquidating Trust has determined the then-current address of such holder, at which time the Distribution to such holder shall be made to the holder without interest.  Amounts in respect of any undeliverable Distributions made by the F-Squared Liquidating Trust shall be returned to, and held in trust by, the F-Squared Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code, as set forth in Article V.E.3 of the Plan.  The F-Squared Liquidating Trust shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided*, *however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

b.        Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions would be $50.00 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Liquidating Trustee.

c.        Unclaimed Property

Except with respect to property not Distributed because it is being held in the Disputed Claims Reserve, Distributions that are not claimed by the expiration of six (6) months from the relevant Distribution Date shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code and shall vest or revest in the F-Squared Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled.  After the expiration of that six month period, the claim of any Entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require the F-Squared Liquidating Trust to attempt to locate any holder of an Allowed Claim.  All funds or other property that vest or revest in the F-Squared Liquidating Trust pursuant to this paragraph shall be (a) used to pay the fees and expenses of the F-Squared Liquidating Trust as and to the extent set forth in the Liquidating Trust Agreement, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims. In the event the Liquidating Trustee holds Liquidating Trust Assets after all Liquidating Trust Operating Expenses and Distributions are made, such remaining Liquidating Trust Assets shall be liquidated to Cash and distributed to some charitable organization of the Liquidating Trustee's choice, assuming such distribution is economically feasible. Neither unclaimed property nor any Liquidating Trust Assets, shall escheat to any federal, state or local government or other entity.

15

8.        **Time Bar to Cash Payments by Check**

Checks issued by the F-Squared Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to Article V.G of the Plan shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of six (6) months from the Effective Date or ninety (90) days after the date of issuance thereof.  After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the F-Squared Liquidating Trust as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code and be distributed as provided in Article V.E.3 of the Plan.

9.        **Compliance with Tax Requirements**

In connection with making Distributions under the Plan, to the extent applicable, the F-Squared Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The F-Squared Liquidating Trust may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any Governmental Unit.  Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any Governmental Unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.E.1 of the Plan.

10.       **No Payments of Fractional Dollars**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

11.       **Post-Petition Interest on Claims**

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Filing Date on any Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

12.       **Setoff and Recoupment**

The F-Squared Liquidating Trust may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates, or the F-Squared Liquidating Trust may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates, or the F-Squared Liquidating Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim.

F.        **Means for Implementation and Execution of the Plan**

1.        **Appointment of the Liquidating Trustee and the Liquidating Trust Committee**

On or prior to the Confirmation Date, the Creditors' Committee, with approval from the Debtors, which shall not be unreasonably withheld, shall appoint the Liquidating Trustee and the three (3) member Liquidating Trust Committee.  The identities of the Liquidating Trustee and the members of the Liquidating Trust

Committee shall be included in the Plan Supplement. The Liquidating Trustee shall serve at the direction of the Liquidating Trust Committee and in accordance with the Liquidating Trust Agreement and the Plan; *provided*, *however*, the Liquidating Trust Committee may not direct the Liquidating Trustee or the members of the Liquidating Trust Committee to act inconsistently with their duties under the Liquidating Trust Agreement and the Plan.

## 2.    Formation of the F-Squared Liquidating Trust

On the Effective Date, the F-Squared Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, inter alia, (a) administering the Liquidating Trust Fund, (b) resolving all Disputed Claims, (c) pursuing, to the extent it sees fit, the Retained Causes of Action, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The F-Squared Liquidating Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Section 301.7701-4(d) and the sole purpose of the F-Squared Liquidating Trust shall be to liquidate and distribute the Liquidating Trust Assets in accordance with United States Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to and consistent with its liquidating purpose.

As soon as reasonably possible after the Effective Date, (i) the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets, and (ii) the Liquidating Trustee shall establish appropriate means to apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the F-Squared Liquidating Trust, the Beneficiaries and the Liquidating Trust Committee) for all federal income tax purposes. The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the F-Squared Liquidating Trust that are required by any Governmental Unit.

## 3.    Funding of the F-Squared Liquidating Trust

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the F-Squared Liquidating Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief, and the Confirmation Order shall be considered an order granting such relief. The transfer of the Liquidating Trust Assets to the F-Squared Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. For all federal income tax purposes, the transfer of the Liquidating Trust Assets to the F-Squared Liquidating Trust shall be treated as (1) a transfer of the Liquidating Trust Assets directly to the Beneficiaries (other than to the extent such Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer of such Liquidating Trust Assets by the Beneficiaries to the F-Squared Liquidating Trust in exchange for the beneficial interests in the F-Squared Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the F-Squared Liquidating Trust (other than the Liquidating Trust Assets as are allocable to Disputed Claims). Upon the transfer of the Liquidating Trust Assets, the F-Squared Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.

## 4.    Rights and Powers of the Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the F-Squared Liquidating Trust, including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement, (2) liquidate the assets transferred to the F-Squared Liquidating Trust on the Effective Date, (3) subject to the Liquidating Trust Agreement, prosecute, settle, abandon or compromise the Retained Causes of Action, (4) make Distributions as contemplated hereby, (5) establish and administer any necessary reserves for Disputed Claims that may be required, (6) subject to the Liquidating Trust Agreement, object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve such objections, and (7) subject to the Liquidating Trust Agreement, employ and compensate professionals and other agents; provided, however, that any such compensation shall be made only out of the Liquidating Trust Operational Reserve, in each case to the extent not inconsistent with the status of the F-Squared Liquidating Trust as a

liquidating trust within the meaning of United States Treasury Regulation Section § 301.7701-4(d) for federal income tax purposes.  The Liquidating Trustee shall be the successor to all of the privileges of the Estates and the Debtors including, but not limited to, the attorney/client privilege.

### 5. Fees and Expenses of the F-Squared Liquidating Trust

The Liquidating Trust Expenses incurred on or after the Effective Date shall be paid in accordance with the F-Squared Liquidating Trust Agreement without further order of the Bankruptcy Court.

### 6. Periodic Reports Filed by the F-Squared Liquidating Trust

The Liquidating Trustee may file periodic reports regarding the liquidation or other administration of property comprising the F-Squared Liquidating Trust, the Distributions made by it and other matters required to be included in such report in accordance with the Liquidating Trust Agreement.  In addition, the Liquidating Trustee will file tax returns for the F-Squared Liquidating Trust treating the F-Squared Liquidating Trust (other than the Liquidating Trust Assets allocable to Disputed Claims) as a grantor trust pursuant to United States Treasury Regulation Section 1.671-4(a).

### 7. Directors/Officers/Managers and Other Authorized Persons of the Debtors

On the Effective Date, the authority, power and incumbency of the persons then acting as directors, officers, managers and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.

### 8. Liquidation, Dissolution, and Termination of the Debtors

a.    As soon as practicable after the Effective Date, the Liquidating Trustee, on behalf of each Debtor, is authorized to and shall (a) file each Debtor's certificate of dissolution, cancellation, termination or such similar document, together with all other necessary documents, to effect such Debtor's dissolution and/or termination of its existence under the applicable laws of its state of incorporation, formation or domicile; and (b) complete and file each Debtor's final federal, state and local tax returns.  The filing of each Debtor's certificate of dissolution, cancellation, termination or such similar document shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members or the board of directors of each such Debtor.  In addition, the Liquidating Trustee shall be authorized, without any action by the stockholders, members or the board of directors of each Debtor, in the name and on behalf of each Debtor, to complete and file each Debtor's final federal, state, and local tax returns.

b.    On the Effective Date, each Debtor shall be deemed to, and shall take all necessary steps to, assign, transfer and distribute to the F-Squared Liquidating Trust the Liquidating Trust Assets, including all of the Debtors' books and records in whatever form and wherever located.

### 9. Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

### 10. Establishment of the Administrative Bar Date

a.    The Plan establishes the Administrative Bar Date, which is contemplated to be approved by the Bankruptcy Court pursuant to the Confirmation Order.

b.    Except as otherwise provided in the Plan or the Confirmation Order, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Bar Date, each holder of an

Administrative Claim (to the extent such holder has not previously been paid)  must File with the Bankruptcy Court a request for payment of such Administrative Claim.

c.    Any holder of an Administrative Claim that is required to File a request for payment of such Administrative Claim that does not File such request with the Bankruptcy Court by the Administrative Bar Date, shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors and/or the F-Squared Liquidating Trust, and such Administrative Claim shall be deemed released and discharged as of the Effective Date.

**11.    Term of Injunctions or Stays**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Chapter 11 Cases are closed.

**12.    Cancellation of Equity Interests**

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing the Equity Interests shall be deemed automatically cancelled and shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto, including any obligation of the Debtors to pay any type of taxes on account of such Equity Interests, shall be discharged.

**13.    Dissolution of the Creditors' Committee**

As of the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from the Chapter 11 Cases.  The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date; *provided*, *however*, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date solely with respect to applications Filed pursuant to Sections 328, 330, and 331 of the Bankruptcy Code.

**G.    Procedures for Resolving and Treating Disputed Claims**

**1.    No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

**2.    Resolution of Disputed Claims**

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw, or resolve in any manner approved by the Bankruptcy Court, objections to Claims.  The costs of pursuing the objections to Claims shall be borne by the F-Squared Liquidating Trust.  From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

**3.    Estimation of Claims**

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any Claim to the extent permitted by Section 502(c) of the Bankruptcy Code.

### 4.    Disallowance of Claims

Any Claims held by Entities from which property is recoverable under Section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is a Retained Cause of Action, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or Liquidating Trustee, as applicable.

### 5.    Adjustment to Claims Without Objection

Any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended or superseded, may be marked as satisfied, adjusted, or expunged on the Claims Register by the Noticing Agent at the direction of the Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 6.    Amendments to Claims or Interests

After the Confirmation Date, a proof of Claim or Interest may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim or Interest solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

### H.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

a.    Subject to Article III.H.3., on the Effective Date, except to the extent that a Debtor either previously has assumed, assumed and assigned, or rejected an executory contract or unexpired lease by an order of the Bankruptcy Court, including, but not limited to, the Sale Order, or has filed a motion to assume or assume and assign an executory contract or unexpired lease prior to the Effective Date, each executory contract and unexpired lease entered into by a Debtor prior to the Filing Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to Section 365 of the Bankruptcy Code.  Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

b.    Notwithstanding anything contained in the Plan to the contrary, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the rights of the Debtors or the Liquidating Trustee, as applicable, to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed rejection provided for in Article VII.A.1 of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

2.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after service of notice of the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.D of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

3.    **Insurance Policies**

Except for the Rejected Insurance Policies (if any), which shall be rejected as set forth in Article III.H.1., nothing in the Plan, the Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Debtors' insurance policies or modifies the coverage or benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Debtors' insurance policies.

I.    **Conditions Precedent to Effective Date of the Plan**

1.    **Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

a.    The Confirmation Order has become a Final Order.

b.    The Confirmation Order shall be in full force and effect.

c.    Notwithstanding the foregoing, the Debtors, in consultation with the Creditors' Committee, reserve the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in Article VIII.A of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

J.    **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtors in consultation with the Creditors' Committee.  On or within two (2) Business Days of the Effective Date, the Debtors shall file and serve a notice of occurrence of the Effective Date. Such notice shall contain, among other things, the Administrative Bar Date, the Professionals Claims Bar Date and the deadline to file proofs of claim relating to damages from the rejection of any executory contract or unexpired lease pursuant to the terms of the Plan.

K.    **Release, Injunction, and Related Provisions**

1.    **Compromise and Settlement**

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Equity Interests.

      **2.**      **Releases by the Debtors**

      a.      Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors release, waive and discharge the Releasees from any and all Causes of Action, claims, debts, obligations, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, based in whole or in part upon any act or omission in connection with the Releasees' exercise of their business judgment as set forth in the Sale Order.

      b.      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable, and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.

      **3.**      **Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, the Exculpated Parties shall not have or incur, any liability for any act or omission taken or not taken between the Filing Date and the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the post-petition portion of the Sale, the negotiation and Filing of the Disclosure Statement, the Plan or any document implementing the Plan, the Filing of the Chapter 11 Cases, the settlement of Claims, or renegotiation of executory contracts and leases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be Distributed under the Plan, except for their willful misconduct or gross negligence or any obligations that they have under or in connection with the Plan or the transactions contemplated in the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

      **4.**      **Injunction**

      a.      **Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtors;** *provided, however*, **upon confirmation of the Plan and the occurrence of the Effective Date and Distributions under the Plan, the holders of Claims or Equity Interests may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.**

      b.      **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest, from:**

      (i)      **commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors' Estates, the F-Squared Liquidating Trust, their successors and assigns, and any of their assets and properties;**

      (ii)      **enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Debtor's Estate, the F-Squared Liquidating Trust, their successors and assigns, and any of their assets and properties;**

(iii)     **creating, perfecting, or enforcing any encumbrance of any kind against any Debtor's Estate, the F-Squared Liquidating Trust, their successors and assigns, and any of their assets and properties;**

(iv)     **asserting any right of setoff or subrogation of any kind against any obligation due from any Debtor's Estate, the F-Squared Liquidating Trust, or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of claim; or**

(v)     **commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.**

c.     **From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their Estates, their successors and assigns, and any of their assets and properties, any suit, action, or other proceeding, on account of or respecting any claim, Claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

**5.     Releases of Liens**

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, to the extent such exist, all mortgages, deeds of trust, liens, pledges, or other security interests against property of the Estates shall be fully released and discharged and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interest shall revert to the Debtors and the Liquidating Trustee.

**6.     Substantive Consolidation**

a.     The Plan serves as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates of all of the Debtors into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan.  Intercompany Claims and Intercompany Interests are deemed to be satisfied and resolved by the substantive consolidation provided for in the Plan.

b.     The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, confirmation, and Distributions.  If this substantive consolidation is approved, then for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors.  Moreover, (a) no Distribution shall be made under the Plan on account of any Claim held by any one of the Debtors against any of the other Debtors and such Intercompany Claims will be extinguished; (b) no Distribution shall be made under the Plan on account of any Intercompany Interest held by any one of the Debtors in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein; (c) all guaranties of any one of the Debtors of the obligations of any of the other Debtors, to the extent such exist, shall be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the consolidated Debtors' Estates; and (d) every Claim that is timely Filed or to be Filed in the Chapter 11 Cases of any of the Debtors shall be deemed Filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

c.     In addition, notwithstanding any provision of the Plan to the contrary, any holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint,

23

joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation (if such exists), or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

        d.    Any alleged defaults under any applicable agreement, including executory contracts and unexpired leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

        e.    As soon as practicable after the Effective Date, the Liquidating Trustee is authorized to and shall submit an order to the Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes each of the Chapter 11 Cases except the Parent's Chapter 11 Case. The Debtors' consolidated estate shall be administered through the Parent's Chapter 11 Case. Once the Plan has been fully administered, the Liquidating Trustee shall file a final report and a motion seeking a final decree in accordance with Local Rule 3022-1.

        **7.**        **Preservation of Rights of Action**

        a.    Vesting of Causes of Action

        (i)    Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtors may hold against any Entity shall vest upon the Effective Date in the F-Squared Liquidating Trust.

        (ii)    Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Retained Causes of Action, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

        (iii)    Retained Causes of Action and any recoveries therefrom shall remain the sole property of the F-Squared Liquidating Trust (for the sole benefit of the holders Allowed Claims).

        b.    Preservation of All Causes of Action not Expressly Settled or Released

        (i)    Unless a Retained Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such Retained Cause of Action for later adjudication by the Liquidating Trustee (including, without limitation, Retained Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and), therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Retained Causes of Action have been released in the Plan [(including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan)] or any other Final Order (including the Confirmation Order). In addition, the Liquidating Trustee expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which

the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. The Debtors and the Creditors' Committee are investigating potential claims and causes of action belonging to the Estates including, without limitation, any and all entities and potential claims and causes of action identified in Article VIII(B) below. The Debtors and the Liquidating Trustee expressly reserve the right to, among other things, continue such investigations, initiate, pursue or adopt any claims against or relating to any of the parties identified in Article VIII(B) below, or other parties against whom the Debtors may have claims, including, without limitation, any person or entity that filed a proof of claim against one or more of the Debtors and any person or entity to whom the Debtors made a payment or transfer of property within one year prior to the Petition Date.

(ii)     Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated.

## IV.     ALTERNATIVES TO THE PLAN

### A.     Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under Section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case, a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for Distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, holders of certain Allowed Claims may receive lesser distributions on account of their Allowed Claims and would likely have to wait a longer period of time to receive any such Distributions than they would under the Plan.

### B.     Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors, the Creditors' Committee or any other party in interest may attempt to formulate an alternative chapter 11 plan which might provide for the liquidation and Distribution of the Debtors' assets other than as provided in the Plan. However, given that the Plan is an orderly plan of liquidation that seeks to Distribute the Debtors' assets in accordance with the priority scheme set forth in the Bankruptcy Code, the Plan Proponents believe that any alternative chapter 11 plan will be substantially similar to the Plan. Therefore, any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of Distributions and, due to the incurrence of additional Administrative Expenses during the period of delay, may provide for smaller Distributions to holders of Allowed Claims than are currently provided for in the Plan. Thus, the Plan Proponents believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims.

The primary reason why creditors would receive less is that in a chapter 7 case, the trustee would be entitled as compensation to up to 3% of all funds disbursed to creditors or other parties in interest. Moreover, a chapter 7 trustee would not have the historical knowledge of the Debtors, which could be detrimental to recoveries in litigation or in connection with the Earn-Out Payments. Those delays, in addition to being generally adverse to the interests of creditors, likely would cause extra administrative expenses to be incurred, including for counsel to such new trustee to educate her or himself of all the relevant background facts.

## V.     FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE CONFIRMATION AND EXECUTION OF THE PLAN MAY HAVE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.  THE DEBTORS DO NOT OFFER AN OPINION AS TO ANY FEDERAL, STATE, LOCAL OR OTHER TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AS A RESULT OF THE CONFIRMATION OF THE PLAN.  **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**  THE PLAN IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR, EQUITY INTEREST HOLDER, OR OTHER PARTY IN INTEREST.

## VI.    SOLICITATION AND VOTING PROCEDURES

On [●], 2015, the Bankruptcy Court entered the Disclosure Statement Order approving the adequacy of the Disclosure Statement and approving certain procedures for the solicitation and tabulation of votes on the Plan (the "**Solicitation Procedures**").  In addition to approving the Solicitation Procedures, the Disclosure Statement Order established certain dates and deadlines, including the date of the hearing on confirmation of the Plan (the "**Confirmation Hearing**"), the deadline for parties to object to confirmation (the "**Plan Objection Deadline**"), the record date for purposes of determining which creditors are entitled to receive Solicitation Packages and, where applicable, vote on the Plan (the "**Voting Record Date**"), and the date by which ballots must be properly executed, completed, and delivered to BMC Group, Inc. (the "**Voting Agent**") to be counted as votes to accept or reject the Plan (the "**Voting Deadline**").  The Disclosure Statement Order also approved the form of ballot and certain confirmation-related notices.  The Disclosure Statement Order and the Solicitation Procedures should be read in conjunction with the Disclosure Statement.

The discussion of the Solicitation Procedures herein is qualified in its entirety by the actual terms of the Solicitation Procedures that are set forth in the Disclosure Statement Order.

### A.    Distribution of the Solicitation Materials

Pursuant to the Disclosure Statement Order, holders of Claims in Class 3 (General Unsecured Claims) that are entitled to vote on the Plan will receive the following (collectively, the "**Solicitation Package**"):

- A disc containing the Disclosure Statement, the Plan and the Disclosure Statement Order in PDF format;

- a notice containing, among other things, the Voting Deadline, the date and time of the Confirmation Hearing and the Plan Objection Deadline (the "**Confirmation Hearing Notice**");

- a ballot; and

- the Committee Support Letter.

In addition, the Debtors will cause all of the materials in the Solicitation Package (except ballots) to be served on: (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) the Internal Revenue Service; (iv) the SEC; and (v) all Entities requesting notice pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

Finally, the Debtors will cause the Confirmation Hearing Notice to be served on: (i) state and local taxing authorities in which the Debtors did business, (ii) holders of Claims or Equity Interests that are not entitled to vote on the Plan; (iii) all counterparties to executory contracts and leases with the Debtors; and (iv) all persons or entities listed on the Debtors' creditor mailing matrix.

### B.    Voting Instructions and General Tabulation Procedures

#### 1.    Voting Record Dates

The Bankruptcy Court has approved [●], 2015, as the Voting Record Date.  Only holders of Claims in Class 3 as of the Voting Record Date are eligible to vote on the Plan.

### 2.    Voting Deadline

The Bankruptcy Court has approved [●], 2015 at 5:00 p.m. (prevailing Eastern Time), as the Voting Deadline.  The Debtors may extend the Voting Deadline in accordance with the Disclosure Statement Order.

Subject to the tabulation procedures approved by the Disclosure Statement Order, any ballot that is timely and properly submitted will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

**FOR ANSWERS TO ANY QUESTIONS REGARDING THE SOLICITATION PROCEDURES, INCLUDING COMPLETING AND SUBMITTING A BALLOT, PARTIES MAY CALL BMC, THE VOTING AGENT, TOLL FREE AT (888) 909-0100.**

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except ballots), please refer to BMC's website at www.bmcgroup.com/fsquared or request a copy from BMC, by writing to BMC Group, Inc., Attn: F-Squared Investment Management, LLC, P.O. Box 90100, Los Angeles, CA 90009.

## VII.    CONFIRMATION PROCEDURES

### A.    Confirmation Hearing

**The Confirmation Hearing will commence on [●], 2015 at [●] (prevailing Eastern Time)**, before The Honorable Laurie Selber Silverstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice filed with the Bankruptcy Court.

**The Plan Objection Deadline is [●] (prevailing Eastern Time) on [●], 2015.**

All objections to the Plan (the "**Plan Objections**") must be Filed with the Bankruptcy Court and served on the Debtors, the Creditors' Committee and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

> **THE BANKRUPTCY COURT MIGHT NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

### B.    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code, including, among other things, the following:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors and the Creditors' Committee, as the Plan Proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and

incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation Date is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after the Confirmation Date.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to Section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims or Equity Interests has either voted to accept the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims are Unimpaired.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

## 1.    Best Interests of Creditors Test

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property with a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court usually: (a) estimates the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determines the liquidation Distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compares such holder's liquidation Distribution to the plan Distribution that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtors and the Creditors' Committee believe that the value of any Distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan because, among other reasons, (a) conversion to chapter 7 would require appointment of a chapter 7 trustee, which likely would delay and reduce the present value of Distributions; and (b) the fees and expenses of a chapter 7 trustee and its professionals would likely further reduce Cash available for Distribution. <u>See also</u> Article IV(A), <u>supra</u>.[8]

## 2.    Feasibility

---

[8] The foregoing, along with the analysis in Article IV(A), <u>supra</u>, is being provided in lieu of a liquidation analysis in chart form. The Plan Proponents believe that, under the facts and circumstances of the Chapter 11 Cases, the liquidation analysis set forth herein, along with the other disclosures provided herein, provide "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test, the Debtors have analyzed the ability of the F-Squared Liquidating Trust to meet its obligations under the Plan. Given that the Debtors sold their operating business and are no longer operating, there is not anticipated to be any need for further financial reorganization. Moreover, based on the Debtors' analysis, the F-Squared Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Plan Proponents believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 3.        Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described below, each class of claims or equity interests that is impaired under a plan, accepts the plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance

### 4.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it; *provided, however*, that the plan has been accepted by at least one impaired class (without regard to the votes of insiders).[9] Pursuant to Section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. These concepts are described immediately below.

### 5.        No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly by reviewing its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).

The Plan Proponents do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests satisfy the foregoing requirements for non-consensual confirmation.

### 6.        Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than one-hundred percent (100%) of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

---

[9] Under the Plan, Class 3 is the only Class of Impaired Claims that is entitled to vote on the Plan. If Class 3 votes to reject the Plan, the Debtors reserve the right to amend the Plan to the extent necessary to confirm the Plan notwithstanding such rejection.

Secured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.  Because in essence there are no secured claims here, this factor is irrelevant to the Plan.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.  The Plan provides for option (2) and therefore meets this test.

Equity Interests:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either:  (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a Distribution under the plan.  The treatment of Equity Interests here meets this test.

## VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims in Class 3 (General Unsecured Claims) should read and consider carefully the risk factors below, as well as the other information set forth in the Disclosure Statement, the documents delivered together with this Disclosure Statement, and the documents referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Plan and its implementation.

### A.    Risk Factors that May Affect the Debtors' Ability to Consummate the Plan

#### 1.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, at the Confirmation Hearing, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or amend the Plan.  There can be no assurance the terms of any such alternative chapter 11 plan or amended Plan would be similar or as favorable to the holders of Allowed Claims as those currently proposed in the Plan.

#### 2.    Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

As set forth above, the Debtors and the Creditors' Committee believe that the Plan satisfies all of the requirements.  However, there can be no assurance the Bankruptcy Court will agree.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the Solicitation

Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no Distribution of property whatsoever under the Plan.

### 3. Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

As indicated above, in the event that the Holders of Claims in Class 3 vote to reject the Plan, the Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the Plan and to seek to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 4. The Level of Administrative Claims and Priority Tax Claims Could Make the Plan Lack Feasibility

The Plan sets an Administrative Bar Date and the Bar Date Order set a Governmental Unit Bar Date for Governmental Units to, among other things, file Priority Tax Claims. The Debtors and the Creditors' Committee believe that Cash on hand far exceeds the estimated levels of Allowed Administrative Claims and Allowed Priority Tax Claims. However, because the bar dates for such claims have not yet expired, there can be no assurances that they are correct. If unexpected, significant Administrative Claims and Priority Tax Claims are asserted and ultimately Allowed, the Debtors might not have sufficient Cash to pay all such claims, therefore making the Plan lack feasibility or otherwise incapable of becoming effective.

### 5. Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors and the Creditors' Committee believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created four Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### B. Risk Factors that may Affect Distributions under the Plan

31

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary significantly from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed General Unsecured Claims under the Plan. Below is a description of a number of significant contingencies that could have a material impact on the recoveries that holders of Allowed General Unsecured Claims will receive under the Plan.

### 1.  Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 2.  Earn-Out Payments

Under the terms of the Asset Purchase Agreement, the Debtors, subject to certain contingencies, are entitled to receive Earn-Out Payments from the Purchaser. The Earn-Out Payments are based on a formula (set forth in Section 3.4 of the Asset Purchase Agreement (as amended)) that relies upon the amount of AUA transferred pursuant to the Asset Purchase Agreement that is in the Purchaser's (or its affiliate's) client accounts on the first and second anniversaries of the Sale Closing Date.[10] Because the formula is dependent upon a variable that, by definition, cannot be known until the future, the Debtors cannot project with any certainty what amounts, if any, will be received as Earn-Out Payments and, in turn, will be Distributed to the holders of Allowed General Unsecured Claims. However, to the extent such amounts are substantial, they may have a material impact on the recoveries that holders of Allowed General Unsecured Claims will receive under the Plan.

### 3.  Potential Priority Claims of Former Employees

Prior to the Filing Date, the Debtors terminated a large percentage of their workforce. Certain of those employees may be entitled to, and have not received, severance payments under the terms of their respective employee contracts. According to the claims register (which the Debtors are still analyzing), such amounts could be in excess of [$1.4] million. Pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent the obligation to pay any such amounts arose in the 180 days leading up to the Filing Date, such payments may be entitled to priority up to $12,475.00 per employee claim. Because any such priority amounts are required to be paid in full prior to any payment being made to the holders of Allowed General Unsecured Claims, the Allowed amount of such claims entitled to priority treatment under section 507(a)(4) of the Bankruptcy Code (which have not yet been determined) may have a material impact on the amount of funds that are available for Distribution to the Holders of Allowed General Unsecured Claims.

### 4.  Newfound Research LLC's and Compass Capital Management (US), LLC's Proofs of Claim

#### a.  Newfound's and the Estate's Claims

Newfound Research LLC ("**Newfound**") filed a proof of Claim against the Debtors asserting a $12 million unliquidated Claim for unpaid fees pursuant to a license agreement. The Debtors dispute the validity and amount of the Claim asserted by Newfound. Furthermore, the Debtors and the Creditors' Committee believe that the Estates may have substantial claims against Newfound. The ultimate Allowed amount of Newfound's claim and the outcome of the Debtors' claims against Newfound may have a material impact on the amount of funds that are available for Distribution to the Holders of Allowed General Unsecured Claims.

---

[10] The threshold AUA before any payment would be made is $1 billion. It should be noted that, on the Sale Closing Date, AUA was approximately $250 million.

       b.       Compass Capital Management (US), LLC's Unliquidated Proof of Claim

Relatedly, Compass Capital Management (US), LLC ("**Compass**") has asserted an unliquidated proof of Claim arising out of the Debtors' use of Newfound's product and Compass' belief that Newfound used Compass's confidential, proprietary information in creating its product. The Debtors and Newfound strongly contest these assertions, but there can be no assurance of the outcome of any litigation. Because Compass' proof of claim is unliquidated, the Liquidating Trustee cannot make Distributions until this Claim is resolved or estimated.

     **5.**       **The Virtus Litigation**

       a.       Virtus Investment Partners, Inc. and Related Claims

As set forth above, prior to the Virtus' termination, the Debtors acted as sub-advisors to certain mutual funds of Virtus and its affiliates. Virtus, Virtus Opportunities Trust ("**VOT**"), Virtus Investment Advisors, Inc., Euclid Advisors, LLC, and VP Distributors, LLC (collectively, the "**Virtus Claimants**") each filed a substantially similar proof of Claim in an unliquidated amount against each of the Debtors. The Virtus Claimants allege in each Claim that the Debtors are liable to the Virtus Claimants for indemnification and contribution to the extent that the Virtus Claimants are liable in connection with any of the following disputes: (i) an investigation of Virtus by the SEC; (ii) a putative class action filed against certain Virtus Claimants in the United States District Court for the Southern District of New York, In re Virtus Investment Partners, Inc. Sec. Litig. No. 15-cv-01249 (WHP); and (iii) the Youngers Litigation (as defined below).

Additionally, Leroy Keith Jr., Philip R. McLoughlin, Gerald M. McNamara, James M. Oates, Richard Segerson, and Ferdinand L.J. Vredonock, collectively the Trustees of VOT (the "**Virtus Trustee Claimants**"), filed Claims in an unliquidated amount for indemnity and contribution in connection with the Youngers Litigation (as defined below). The Virtus Trustee Claimants are co-defendants in the Youngers Litigation (as defined below) with the Virtus Claimants and certain of the Debtors. The Debtors dispute any obligation to indemnify the Virtus Claimants or the Virtus Trustee Claimants for any loss in the event the claimants are found liable in connection with the proceedings set forth above, but there can be no assurance of the outcome of any litigation. Because these Claims are unliquidated, the Liquidating Trustee cannot make Distributions until these Claims are resolved or estimated.

       b.       The Youngers Litigation and Related Claims

On May 5, 2015, Mark Youngers filed a purported class action complaint (the "**Youngers Complaint**") on behalf of purchasers of certain shares of Virtus mutual funds against the Virtus Claimants, the Virtus Trustee Claimants, certain of the Debtors, and other individuals in the United States District Court for the Central District of California (the "**Youngers Litigation**"). See Youngers v. Virtus Inv. Partners, Inc. et al., No. 15-cv-03496 (FMO) (JEMx). On October 1, 2015, the Youngers Complaint was amended (the "**Amended Youngers Complaint**") and certain of the Debtors were removed as defendants. The Amended Youngers Complaint noted that causes of actions against certain of the Debtors are stayed as a result of the filing of the Chapter 11 Cases. The Amended Youngers Complaint was filed by Mr. Youngers, Kimball Lloyd, and Frances Briggs, individually and on behalf all others similarly situated (the "**Youngers Plaintiffs**"), and alleges violations of Sections 10(b) and 20(a) of the Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. The Youngers Litigation is still in its nascent stages. In connection with the Youngers Litigation, each of the Youngers Plaintiffs filed a proof of Claim, each in the amount of $500 million, against Debtors F-Squared Investments, Inc., F-Squared Institutional Advisors, LLC, and the Parent, representing the amounts allegedly owed to the plaintiff class. The Debtors dispute the allegations of the Youngers Plaintiffs and the related Claims. The Debtors and the Creditors' Committee also dispute that the Youngers Plaintiffs had the authority to file a proof of Claim on behalf of a class that has not been certified. However, given the magnitude of the asserted Claims, the outcome of the Youngers Litigation and/or the ultimate allowed amount of the related Claims will have a material impact on the amount of funds that are available for Distribution to the Holders of Allowed General Unsecured Claims.

     **6.**       **Uncertain Obligations owed to Howard Present**

As set forth above, the Debtors are no longer the subject of any enforcement action by the SEC. Mr. Present, the Debtors' former chief executive officer, however, remains the subject of a related SEC proceeding. Mr. Present filed two proofs of Claim asserting Claims of more than $11 million on account of severance, tax payment, voting proxy, non-competition, and health benefits obligations allegedly owed to him by certain of the Debtors and more than $2.3 million on account of indemnification obligations allegedly owed to him pursuant to various of the Debtors' organizational documents.  To the extent Mr. Present proves unsuccessful in the ongoing SEC proceeding, the Debtors' obligations to Mr. Present pursuant to their organizational documents will be significantly reduced and Mr. Present may have to return funds advanced to him by the Debtors for his defense in his SEC proceeding.  Furthermore, the Debtors believe that they may also have substantial claims against Mr. Present, which they are continuing to investigate.  Therefore, the outcome of Mr. Present's SEC proceeding, Mr. Present's Claims against the Debtors, and the Debtors' claims against Mr. Present may have a material impact on the amount of funds that are available for Distribution to the Holders of Allowed General Unsecured Claims.

### 7.        Other Substantial Disputed or Unliquidated Claims

There are numerous other large disputed or unliquidated proofs of Claim, the resolution of which could affect the level of Distributions to creditors.  By way of example only, Gold Coast Advisors, LLC ("**Gold Coast**") has asserted a $55 million proof of Claim.  The Debtors believe they have no liability to Gold Cost, but there can be no assurances that a court will agree.

### 8.        Potential Recoveries from D&O Carriers

As set forth above, the Debtors recovered approximately $10 million of legal costs in 2014 under their D&O Policies relating to the SEC Proceeding.  The Debtors believe that they may be able to recover additional amounts under their D&O Policies and such amounts could be up to an additional $10 million (on top of the $10 million that the Debtors already received).  If true, this may have a material impact on the amount of funds that are available for Distribution to the Holders of Allowed General Unsecured Claims.  However, the insurance carriers dispute these claims.  Therefore, whether, and to what extent, the Debtors are able to recover such amounts is uncertain and, even if the Debtors are able to recover such amounts, certain amounts may need to be paid directly to certain of the Debtors' directors and officers, who also are beneficiaries under the policies.

### 9.        Potential Tax Refund

The Debtors believe that they are entitled to a tax refund, but the amount and timing of any such refund cannot be stated with certainty.

### 10.        Other Litigation Claims

Certain possible litigation claims are listed earlier in this section.  The Debtors might have other valuable litigations claims, but an analysis by the Debtors and the Creditors' Committee is still underway.  The quantum, if any, of the proceeds of such litigation and the timing thereof is unknown.

### 11.        Employee Loans

The Debtors have outstanding approximately $2.8 million in loans to former employees.  There is a material risk that these amounts will not be collectible, and a risk that certain former employees might assert counterclaims.

### C.        Disclosure Statement Disclaimer

### 1.        Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **No Legal or Tax Advice is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

3.      **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

4.      **Failure to Identify Claims, Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular Claim, litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors and/or the Creditors' Committee may seek to investigate Claims, File and prosecute objections to Claims, and the Liquidating Trustee may object to Claims or bring Causes of Action after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, Causes of Action, or objections to Claims.

5.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Liquidating Trustee to object to that holder's Allowed Claim, or to bring Causes of Action, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

6.      **Information was Provided by the Debtors and was Relied upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

7.      **Potential Exists for Inaccuracies, and the Debtors have no Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

IX.     **CONCLUSION**

**THE PLAN PROPONENTS SUBMIT THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE.**

RLF1 13173029v.2

**THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN CLASS 3 VOTE TO ACCEPT THE PLAN.**

**IN ADDITION, AS IS SET FORTH IN THE COMMITTEE SUPPORT LETTER THAT WAS INCLUDED IN THE SOLICITATION PACKAGE, THE CREDITORS' COMMITTEE, WHO REPRESENTS THE INTERESTS OF ALL GENERAL UNSECURED CREDITORS, HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND URGES SUCH CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

Dated:  October 28, 2015  
      Wilmington, Delaware

F-Squared Investment Management, LLC (for itself and on behalf of its Debtor affiliates)

By: _/s/ David N. Phelps_____  
      Name:  David N. Phelps  
      Title:  Chief Restructuring Officer